Michael D. Cok
Jonathan M. Cok
COK KINZLER PLLP
35 North Bozeman
P. O. Box 1105
Bozeman, Montana 59771-1105
Telephone: (406) 587-4445
mikecok@cokkinzlerlaw.com
jcok@cokkinzlerlaw.com

Elizabeth K. Green (pro hac vice)
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
egreen@kantorlaw.net

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA, BUTTE DIVISION

## \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JESSICA U., | **PLAINTIFF'S RESPONSIVE** |
| | **BRIEF IN SUPPORT OF** |
| Plaintiff, | **PLAINTIFF'S MOTION FOR** |
| | **SUMMARY JUDGMENT** |
| v. | |
| | |
| | Civil Action No. 6:18-cv-00005 |
| BLUE CROSS AND BLUE SHIELD | |
| OF MONTANA, | |
| | |
| Defendant. | |

## TABLE OF CONTENTS

I.    Introduction ...................................................................................1

II.   Statement of Facts ..........................................................................3

    A.   The MCG Guidelines Do Not Satisfy the Plan Requirements...................3

    B.   There Were No In-Network Providers in Montana for Residential
Treatment of Eating Disorders...............................................................5

    C.   Jessica's Home Passes Were Not "Successful" Or "Without Incident".....5

    D.   Jessica Had Self-Harm Urges and Could Not Consistently Contract for
Her Safety ..........................................................................................7

III.  Plaintiff's Response to Blue Cross's Arguments .................................8

    A.   Additional Evidence Is Permissible To Conduct an Adequate De Novo
Review ...............................................................................................8

    B.   Blue Cross Improperly Applied MCG Guidelines in Lieu of the Plan
Terms ..............................................................................................10

    C.   The MCG Guidelines Are Not "Generally Accepted Standards of Medical
Practice" ..........................................................................................12

       1.   "Imminent Danger" is Not the Standard of Care...................................13

       2.   "Self-Care" Is Not the Standard of Care................................................16

       3.   "Severe Disability" is Not the Standard of Care ...................................18

       4.   Jessica Required Structured Residential Level of Care..........................20

    D.   Jessica's Benefits Are Payable According to a Single Case Agreement
Because Blue Cross Did Not Have Any Contracted Providers in Montana for
the Requested Services ......................................................................22

    E.   The Court May Give Less Weight to Blue Cross's Decisions Based on Its
Failure to Provide a Full and Fair Review...................................... 25

    F.   Plaintiff Seeks Proper Remedies...........................................................28

IV.  Requested Relief................................................................................29

# TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Abatie v. Alta Health & Life Ins. Co.*,
   458 F.3d 955 (9th Cir. 2006) ............................................................................9, 10

*Acosta v. City Nat'l Corp.*,
   No. 17-55421, 2019 WL 1770032 (9th Cir. Apr. 23, 2019)..................................28

*Blankenship v. Liberty Life Assur. Co. of Bos.*,
   No. C-03-1132 SC, 2004 WL 1878211 (N.D. Cal. Aug. 20, 2004)......................10

*Boyd v. Sysco Corp.*,
   No. 4:13-CV-00599-RBH, 2015 WL 7737966 (D.S.C. Dec. 1, 2015) ...........26, 27

*Clifford W. v. Berryhill*,
   No. 17 CV 4850, 2019 WL 1505533 (N.D. Ill. Apr. 5, 2019) ..............................15

*D. v. United Healthcare Ins. Co.*,
   No. 15CV1012 JM(BLM), 2016 WL 4072725 (S.D. Cal. Aug. 1, 2016).............21

*Doe v. Harvard Pilgrim Health Care, Inc.*, No.,
   CV 15-10672, 2017 WL 4540961 (D. Mass. Oct. 11, 2017) ...............................21

*E.R. v. UnitedHealthcare Ins. Co.*,
   248 F. Supp. 3d 348 (D. Conn. 2017)..................................................................17

*Fortlage v. Heller Ehrman, LLP*, No. C,
   08-3406 VRW, 2010 WL 1729462 (N.D. Cal. Apr. 27, 2010) ............................10

*Fuchs v. Astrue*,
   873 F.Supp.2d 959 (N.D. Ill. 2012)....................................................................15

*Glista v. Unum Life Ins. Co. of Am.*,
   378 F.3d 113 (1st Cir. 2004)...............................................................................22

*Hall v. Metro. Life Ins. Co.*,
   259 F. App'x 589 (4th Cir. 2007) .......................................................................25

*Harlick v. Blue Shield of California*,
   686 F.3d 699 (9th Cir. 2012) ..............................................................................22

*Hoover v. Provident Life and Accident Ins. Co.*,
   290 F.3d 801 (6th Cir. 2002) ..............................................................................25

*Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried
   Employees of Transferred GE Operations*,
   244 F.3d 1109 (9th Cir. 2001) ..............................................................................9

*Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*,
    349 F.3d 1098 (9th Cir. 2003) ..................................................................9

*King v. Detroit Med. Ctr.*,
    No. 01-72992, 2003 WL 23354130 (E.D. Mich. Sept. 24, 2003) .......................11

*Lukas v. United Behavioral Health*,
    504 F. App'x 628 (9th Cir. 2013) ...........................................................27

*Mitchell v. CB Richard Ellis Long Term Disability Plan*,
    611 F.3d 1192 (9th Cir. 2010) ................................................................22

*Mongeluzo v. Baxter Travenol Long Term Disability Benefits Plan*,
    46 F.3d 938 (9th Cir. 1995) ...............................................................9, 10

*Nguyen v. Sun Life Assurance Co. of Canada*,
    No. 314CV05295JSTLB, 2015 WL 6459689 (N.D. Cal. Oct. 27, 2015) .............24

*Nieves v. Prudential Ins. Co. of Am.*,
    233 F. Supp. 3d 755 (D. Ariz. 2017) .......................................................22

*Niles v. Am. Airlines, Inc.*,
    269 F. App'x 827 (10th Cir. 2008) ..........................................................25

*Opeta v. Nw. Airlines Pension Plan for Contract Employees*,
    484 F.3d 1211 (9th Cir. 2007) .................................................................9

*Punzio v. Astrue*,
    630 F.3d 704 (7th Cir. 2011) ................................................................15

*Quesinberry v. Life. Ins. Co. of N. Am.*,
    987 F.2d 1017 (4th Cir. 1993) ................................................................9

*Russo v. Hartford Life & Accident Ins. Co.*,
    No. CIV. 00-938-LSP(CGA), 2002 WL 32138296 (S.D. Cal. Feb. 5, 2002) .......10

*Stacy S. v. Boeing Co. Employee Health Benefit Plan (Plan 626)*,
    344 F. Supp. 3d 1324 (D. Utah 2018)...................................................18, 19

*Knopp v. Life Ins. Co. of N. Am.*, No. C-09-0452 CRB (EMC),
    2009 WL 5215395 (N.D. Cal. Dec. 28, 2009).............................................25

*Todd R. v. Premera Blue Cross Blue Shield of Alaska*,
    No. C17-1041JLR, 2019 WL 366225 (W.D. Wash. Jan. 30, 2019)...............11, 25

*Weaver v. Phoenix Home Life Mut. Ins. Co.*,
    990 F.2d 154 (4th Cir. 1993) .............................................................25, 26

*Wit v. United Behavioral Health*,
    No. 14-CV-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019) ..........passim

iii

Federal Statutes

29 U.S.C. § 1022(b) ....................................................................11
29 U.S.C. § 1132(g)(1) ...............................................................28

Federal Regulations

29 C.F.R. § 2560.503-1(g)(1)(iii) ...............................................19
29 C.F.R. § 2560.503-1(g)(1)(v)(B) ...........................................26
29 C.F.R. § 2560.503-1(h) ...........................................................8
29 C.F.R. § 2560.503-1(j)(5)(ii) ..................................................26
29 C.F.R. § 2590.712(c)(4)(ii)(F) ...............................................18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

Plaintiff Jessica U. seeks mental health benefits for residential treatment pursuant to an ERISA health benefit plan (the "Plan") insured and administered by Defendant Blue Cross and Blue Shield of Montana ("Blue Cross"). The applicable standard of review is de novo. Blue Cross is not entitled to summary judgment because Blue Cross incorrectly denied Jessica's mental health benefits, did not comply with the terms of the Plan, did not meet its obligations under ERISA, and improperly reimbursed benefits.

First, Blue Cross did not comply with the terms of the Plan. Jessica's treatment was medically necessary and payable pursuant to the terms of the Plan which requires payment of medically necessary treatment according to the "generally accepted standards of medical care." Blue Cross did not apply this Plan language. Instead, Blue Cross applied "MCG Guidelines" to deny Jessica's benefits. The MCG Guidelines are not incorporated or referenced in the Plan. The MCG Guidelines do not represent the generally accepted standards of medical care because the MCG Guidelines emphasize acute symptoms instead of treating the patient's overall condition. Each of Blue Cross's reviewers applied the MCG Guidelines – thus, each of the resulting denials was similarly tainted by inapplicable guidelines.

1

Second, Blue Cross incorrectly denied benefits on the basis that Jessica's treatment was not medically necessary. Blue Cross's decision is not supported by the medical records. The record shows that Jessica is a young woman with a history of mental illness including anorexia nervosa and generalized anxiety disorder. At age 16, Jessica's condition deteriorated such that she required residential treatment. She was admitted to Avalon Hills Treatment Center ("Avalon"), a treatment center specializing in the treatment of patients with eating disorders. Following an initial approval of benefits, Blue Cross denied benefits for Jessica's residential treatment, claiming that her treatment was not medically necessary. Jessica's eating disorder behaviors, ambivalence toward recovery, desire to lose weight, and self-harming urges and behaviors necessitated residential treatment. Avalon correctly recommended residential treatment for Jessica's safety and ongoing recovery.

Third, Blue Cross did not meet its obligations under ERISA including: not applying the Plan terms, not providing reasonable explanations for denial, and not fully investigating Jessica's claim. Blue Cross did not comply with the most basic duty of an ERISA fiduciary when Blue Cross failed to respond to Jessica's appeal regarding the reimbursement rate Blue Cross applied to her claims. Under a de novo review, the Court may apply less weight to Blue Cross's decisions in light of these procedural errors.

Fourth, Blue Cross did not correctly pay benefits that it did approve for

2

Jessica's treatment. The record contains no evidence to support the reimbursement rate applied by Blue Cross. Only now, four years after Jessica's appeal, Blue Cross attempts to defend its reimbursement rate. Blue Cross's new arguments and the new information it seeks to submit are inadmissible because they were never provided to Jessica in response to her appeal. Furthermore, the information still does not substantiate the reimbursement rate applied to Jessica's claims. Blue Cross had the opportunity and obligation to respond to Jessica's appeal regarding the rate of reimbursement. Blue Cross failed to do so and may not now sandbag Jessica with arguments and information which should have been provided four years ago.

Plaintiff requests that the Court deny Blue Cross's request for summary judgment and enter judgment in Plaintiff's favor.

## II.   <u>Statement of Facts</u>

Plaintiff refers the Court to Plaintiff's Statement of Disputed Facts for specific responses to the facts presented by Blue Cross. Plaintiff highlights the following disputed facts for discussion.

### A.   <u>The MCG Guidelines Do Not Satisfy the Plan Requirements</u>

The Plan does not authorize Blue Cross to "utilize" the MCG Guidelines to determine whether treatment is medically necessary. (AR0172-0276). There is no reference to the MCG Guidelines in the Plan. *Id.* The MCG Guidelines (AR0604-

3

0604-0607) do not satisfy the Plan definition for "medically necessary":

> Health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:
>
> 1. in accordance with generally accepted standards of medical practice;
>
> 2. clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease; and
>
> 3. not primarily for the convenience of the patient, Physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the view of Physicians practicing in relevant clinical areas and any other relevant factors.
>
> The fact that services were recommended or performed by a Covered Provider does not automatically make the services Medically Necessary. The decision as to whether the services were Medically Necessary can be made only after the Member receives the services, supplies, or medications and a claim is submitted to The Plan. The Plan may consult with Physicians or national medical specialty organizations for advice in determining whether services were Medically Necessary. (AR0247).

The MCG Guidelines are not based on credible scientific evidence, peer-reviewed medical literature, or Physician Specialty Society recommendations. Rather, the opposite is true. As explained below, the MCG Guidelines are contradicted by the

standard of case for residential treatment.

**B.**     **There Were No In-Network Providers in Montana for Residential Treatment of Eating Disorders**

Blue Cross agrees that it did not have a provider for Jessica's residential treatment within 50 miles of her home in Bozeman, Montana. In fact, there were no residential or partial hospitalization treatment centers for eating disorders in Montana. (AR1329 "no in-network eating disorder [facility] in Montana"). The "exact same service," *i.e.* residential or partial hospitalization eating disorder treatment, was not available in Montana. Therefore, Jessica disputes Blue Cross's claim that it could pay Avalon the amount it would pay to a "contracted provider" in Montana for the "exact same service" because no such provider exists for eating disorder treatment. (Df's motion at p. 4).

**C.**     **Jessica's Home Passes Were Not "Successful" Or "Without Incident"**

Jessica disputes Blue Cross's conclusion that Jessica completed her home passes "successfully and without incident." (Df's motion at pp. 5-6). The record does not support the statement. During her first home pass, Jessica restricted meals on her home pass. (AR0169). She became distraught upon weighing herself and learning her actual weight and suffered body image distress. (AR0071, 0087). She

5

struggled with family relationships at home. (AR1213). She admitted "continual urges to harm self" and self-harmed at home. (AR0087, 1213). She self-harmed upon return to Avalon by excessively rubbing her wrists to the point of creating a burn mark on her wrists. (AR0069, 0385). She self-harmed out of fear of relapse. (AR0385).

Jessica's second home pass was delayed because Jessica reported that she would self-harm if she went home for a pass. (AR1114). For Jessica's safety, the pass was rescheduled until she could agree to not self-harm. During her second home pass, Jessica restricted 5-6 times by not eating when her parents were not present and "she had the opportunity to get away with it." (AR1032, 1108). She also threw away her dinner when she felt overwhelmed by the calorie content. (AR1108). She had strong self-harm urges while on the pass. (AR1033). She lost weight while on the pass. (AR1165). Her treatment team scheduled an additional pass for Jessica to try again. (AR1206).

Regarding her third home pass, Jessica disputes Blue Cross's claim that she was "complaint with her meal plan" and "drank fluids . . . as directed" and "was able to maintain her weight while home." (Df's SUMF ¶ 32; Df's motion at p. 6). Jessica reported "she didn't 'do too well' with fluids over the course of the pass." (AR1158). Jessica reported "she restricted food on her pass and that she struggled

with getting her food intake" (AR1158), "she restricted while on pass for 'about 7 days total.' . . . Jessica stated that she had a 'challenging' pass" (AR1139), and "Jess doesn't feel the pass went very well at all." (AR1158). Jessica struggled with intuitive eating during her pass "with weight trending down 1.5 pounds during her pass." (AR1104).

### D.   Jessica Had Self-Harm Urges and Could Not Consistently Contract for Her Safety

Jessica disputes Blue Cross's statement that Jessica "largely denied suicidal or self-harm thoughts altogether" and when she had urges, was able to "manage" them well. (Df's SUMF ¶ 26). Blue Cross's quote to the record, *i.e.* "she was able to manage the urges well," is taken out of context and does not refer to Jessica's ability to manage self-harm urges through the rest of treatment. The statement was in Jessica's therapist note on July 31, 2015 and referred to Jessica's urges to self-harm during her last home pass. (AR1034). In fact, Jessica could not consistently contract for safety. (AR1114). For example, on July 9, 2015, her treatment team wrote: "Jessica reported a significant increase in self-harm thoughts and urges daily over the past week. She has been on clinical watch for the past 6 days due to being unwilling to contract for safety. Jessica is also reporting she will self-harm if she goes home for a pass this week and due to these changes in risk her 2 week

pass is being rescheduled." (AR1114, 1145). She continued to have high self-harm urges and guilt for having given in to them. (*i.e.* AR1030, 1031, 1035, 1036 ("feeling stuck and fearful that she is unable to consistently contract for safety due to ongoing strong urges to harm herself."), AR1038 ("reported 9 out of 10 for self-harm urges and was unable to contract for safety"), AR1117, 1170, 1171, 1210). She had intermittent passive suicidal ideation. (AR1030).

III.   **Plaintiff's Response to Blue Cross's Arguments**

Under a de novo review, Plaintiff is entitled to judgment in her favor because her treatment was medically necessary, Blue Cross incorrectly paid benefits, and failed to comply with ERISA.

A.   **Additional Evidence Is Permissible To Conduct an Adequate De Novo Review**

Blue Cross did not respond to Jessica's appeal regarding the rate of reimbursement and single case agreement. (AR1327-1329). Blue Cross violated ERISA regulations regarding appeal determinations and precluded Plaintiff from receiving a full and fair review under ERISA. 29 C.F.R. § 2560.503-1(h). When the actions of the administrator have prevented the claimant from receiving a full and fair review, the Court may review additional evidence to conduct an adequate de novo review.

The Court is not limited to the administrative record in conducting a de novo review. *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003). The Court may consider evidence beyond the administrative record "if circumstances clearly establish that [it] is necessary to conduct an adequate de novo review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefits Plan*, 46 F.3d 938, 944 (9th Cir. 1995) (*quoting Quesinberry v. Life. Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)) (describing circumstances that support considering evidence outside of the administrative record); *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1115 (9th Cir. 2001).

In *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972–73 (9th Cir. 2006), the Ninth Circuit confirmed that an administrator's procedural violations may necessitate the court reviewing additional evidence under a de novo review. Here, Blue Cross "engage in a procedural irregularity that has affected the administrative review" by not responding to Jessica's appeal. Blue Cross's actions prevented Jessica from receiving a full and fair review and permit the Court to consider additional evidence to conduct an adequate de novo review. Blue Cross incorrectly relies on *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1219 (9th Cir. 2007) which did not consider whether a procedural

9

violation warranted additional evidence considered under a de novo review.

Courts in the Ninth Circuit have applied *Mongeluzo* and *Abatie* to allow additional evidence under a de novo review when administrators have violated ERISA procedures during the appeal process, thereby preventing the claimant from receiving a full and fair review. *See Russo v. Hartford Life & Accident Ins. Co.*, No. CIV. 00-938-LSP(CGA), 2002 WL 32138296, at *8 (S.D. Cal. Feb. 5, 2002) (Hartford's procedural violations warranted admitting additional evidence); *Blankenship v. Liberty Life Assur. Co. of Bos.*, No. C-03-1132 SC, 2004 WL 1878211, *6 (N.D. Cal. Aug. 20, 2004), *aff'd*, 486 F.3d 620 (9th Cir. 2007) (where "a plaintiff was not given the opportunity to present additional evidence to the administrator because the administrator failed to follow the statutory notice requirement, the district court may properly consider that evidence in making its eligibility determination."); *Fortlage v. Heller Ehrman, LLP*, No. C 08-3406 VRW, 2010 WL 1729462, at *3 (N.D. Cal. Apr. 27, 2010) (the administrator's "clear procedural violation" provided the magistrate with the option to consider evidence outside of the administrative record).

## B. Blue Cross Improperly Applied MCG Guidelines in Lieu of the Plan Terms

In conducting a de novo review, the Court must weigh the evidence and

decide how much weight to give to Blue Cross's decisions. *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, No. C17-1041JLR, 2019 WL 366225, at *2 (W.D. Wash. Jan. 30, 2019) (a de novo review involves "factual findings, evaluate credibility, and weigh evidence"). In weighing the evidence, Plaintiff contends that the Court should apply little to no weight to Blue Cross's decisions because Blue Cross did not apply the Plan language and instead relied on "MCG Guidelines" to deny Jessica's claims and Blue Cross's denial is not supported by the record. (AR0158).

The Plan requires medically necessary treatment based on the "generally accepted standards of medical practice." (AR0247). The MCG Guidelines are not Plan terms as they are not referenced or incorporated into the Plan. 29 U.S.C. § 1022(b) (plans must contain a description of any circumstance which "may result in . . . denial or loss of benefits"). The MCG Guidelines were developed internally by MCG without input from the plan sponsors. *Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *14 (N.D. Cal. Mar. 5, 2019) (guidelines are not plan terms when they are developed "without input from Plan sponsors"); *King v. Detroit Med. Ctr.*, No. 01-72992, 2003 WL 23354130, at *4 (E.D. Mich. Sept. 24, 2003) (when insurer consistently and strictly relied on guidelines to deny residential treatment, "then it should have incorporated it into the Summary Plan Description or provided notice to the Plan's participants. . .").

11

### C.     The MCG Guidelines Are Not "Generally Accepted Standards of Medical Practice"

The MCG Guidelines are not accepted generally standards of medical practice. The MCG Guidelines are not "peer-reviewed medical literature" or "credible scientific evidence." *Id.* Each Blue Cross medical reviewer was required to apply the MCG Guidelines without the option to review Jessica's treatment based on the generally accepted standards of medical practice. The medical reviewers were not provided the plan language regarding medical necessity. Therefore, every medical review was tainted by the application of improper guidelines.

The recent decision *Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *20 (N.D. Cal. Mar. 5, 2019) is directly on point. The *Wit* decision was the result of a 10-day bench trial in a nationwide ERISA class action challenging the application of UBH mental health guidelines. In *Wit*, Chief Magistrate Judge Joseph Spero heard extensive trial testimony from several medical experts regarding the generally accepted standards of medical care for mental health treatment. *Id.* at *16. Judge Spero concluded that the UBH guidelines deviated from the generally accepted standards of medical care for mental illnesses. Plaintiff makes the same claim here. The MCG Guidelines do not represent, and are more

12

restrictive than, the generally accepted standards of medical care for mental illness. Therefore, the MCG Guidelines do not satisfy the Plan requirements for medical necessity and were improperly applied to Jessica's claims.

The generally accepted standards of medical care require "residential treatment . . . for individuals who do not pose an imminent risk of serious harm to self or others (*i.e.* who do not need inpatient hospitalization), but rather, 'because of specific functional limitations, need safe and stable living environments and 24-hour care." *Id.* at *16. Residential treatment is not limited to addressing acute symptoms to achieve crisis stabilization, instead it is "designed to provide patients with an 'opportunity to engage underlying chronic, recurrent, comorbid issues' so that they are able to 'turn a corner' and move to a lower level of service intensity." *Id.* at *16.

The *Wit* findings have direct application to the MCG guidelines imposed by Blue Cross to deny Jessica's benefits.

### 1.    <u>"Imminent Danger" is Not the Standard of Care</u>

Generally accepted standards of medical care require that effective treatment of patients with mental health conditions "is not limited to the alleviation of the current symptoms. . . . effective treatment requires treatment of the chronic underlying condition as well." *Id.* at *17. Simply put, treatment that only manages

13

the crises is not effective. *Id.* at *17, 22, 31 (factors focusing on "acute," "severe," or "imminent" symptoms "deviate[] from generally accepted standards of care").

The MCG Guidelines deviate from the standard of care for residential treatment by requiring "imminent danger to self," "current plan for suicide," "serious Harm to self are present," "imminent danger to others," "imminent risk for recurrence," and "current plan for homicide." (AR0602). These factors are directly contrary to the standards of care for residential treatment of mental illnesses. Residential treatment is for patients "who do *not pose an imminent risk* of serious harm to self or others." *Id.* (emphasis added). The MCG Guidelines flip the standard of care on its head and require patients to show that they *are* an imminent danger to self. (AR0602).

Blue Cross improperly denied Jessica's benefits based "not at imminent risk of harm" and "had no acute medical issues." (AR0158). In *Wit*, Judge Spero held that these words and phrases refer to "immediate, acute symptoms that brought the member to treatment rather than the broader question that should be considered under generally accepted standards of care, namely, whether the services being considered will be effective in treating not only the current symptoms but also the individual's underlying condition." *Wit*, 2019 WL 1033730, at *22-23.

Blue Cross misstates the record regarding Jessica's self-harm urges. Blue

14

Cross emphasizes a single therapy note and ignores the totality of Jessica's treatment. Mental illnesses are episodic by nature and mentally ill patients will have good days and bad days, and "a snapshot of any single moment says little about [the individual's] overall condition." *Clifford W. v. Berryhill*, No. 17 CV 4850, 2019 WL 1505533, at \*6 (N.D. Ill. Apr. 5, 2019) (*quoting Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Fuchs v. Astrue*, 873 F.Supp.2d 959, 971 (N.D. Ill. 2012) ("Mental illnesses are episodic by nature.").

The record shows that Jessica was in danger to herself by her urges to self-harm and actual self-harm in and out of treatment. These were deliberate acts of serious harm. Jessica could not consistently contract for safety. (AR1114). She was on "clinical watch" due to her inability to promise not to hurt herself. (AR1114, 1145). She stated she would hurt herself if she went home on a pass and therefore Avalon had to reschedule her pass for her own safety. *Id.* She continued to have high self-harm urges and guilt for having given in to them. (i.e. AR1030, 1031, 1035, 1036 ("feeling stuck and fearful that she is unable to consistently contract for safety due to ongoing strong urges to harm herself."), 1038 ("reported 9 out of 10 for self-harm urges and was unable to contract for safety"), 1117, 1170, 1171, 1210). She had intermittent passive suicidal ideation. (AR1030). These were dangers appropriately managed in 24/7 residential treatment.

15

## 2.    "Self-Care" Is Not the Standard of Care

Blue Cross claims that Jessica's ability to "care for herself" while on home passes eliminated the need for residential treatment. Not so. Just because "a lower level of care is less restrictive or intensive does not justify selecting that level if it is also expected to be less effective. Placement in a less restrictive environment is appropriate only if it is likely to be safe and just as effective as treatment at a higher level of care in addressing a patient's overall condition, including underlying and co-occurring conditions." *Wit*, 2019 WL 1033730, at *19. Jessica was in a less restrictive environment on home pass and that reduced treatment was not as effective as what she received at Avalon to treat her overall condition. Residential treatment is "designed to provide patients with an 'opportunity to engage underlying chronic, recurrent, comorbid issues' so that they are able to 'turn a corner.'" *Id.* at *16.

Jessica did not "turn a corner" on her home passes. During her first home pass, Jessica restricted meals on her home pass. (AR0169). She became distraught upon weighing herself and learning her actual weight and body image distress. (AR0071, 0087). She struggled with family relationships at home. (AR1213). She admitted "continual urges to harm self" and self-harmed at home. (AR0087, 1213). She self-harmed upon return to Avalon. (AR0069, 0385).

16

During her second home pass, Jessica restricted 5-6 times by not eating when her parents were not present and "she had the opportunity to get away with it." (AR1032, 1108). She also threw away her dinner when she felt overwhelmed by the calorie content. (AR1108). She had strong self-harm urges while on the pass. (AR1033). She lost weight while on the pass. (AR1165). Her treatment team scheduled an additional pass for Jessica to try again. (AR1206).

During her third home pass, Jessica "restricted while on pass for 'about 7 days total.' . . . Jessica stated that she had a 'challenging' pass" (AR1139) and Jessica "reports she restricted food on her pass and that she struggled with getting her food intake." (AR1158). Jessica reported "she didn't 'do too well' with fluids over the course of the pass." (AR1158). The dietary progress notes state "Jess doesn't feel the pass went very well at all." (AR1158). Jessica struggled with intuitive eating during her pass "with weight trending down 1.5 pounds during her pass." (AR1104).

The cases relied on by Blue Cross are inapt. Each case was decided under the more stringent abuse of discretion standard which gave the benefit of the doubt to the insurer. In addition, the decision in *E.R. v. UnitedHealthcare Ins. Co.*, 248 F. Supp. 3d 348, 366 (D. Conn. 2017) does not provide details of the patient's home passes. No two eating disorders are identical in presentation. Also, the *E.R.* decision

17

relied on a review from Dr. Allchin who testified for UBH in *Wit* and was deemed by the Court to be "not persuasive" and "only partially credible." *Wit*, 2019 WL 1033730 at *9. The decision *Stacy S. v. Boeing Co. Employee Health Benefit Plan (Plan 626)*, 344 F. Supp. 3d 1324 (D. Utah 2018), does not discuss home passes as a basis for denial.

It is improper to require patients to fail first at a lower level of care before approving a higher level of care. So-called "fail first" policies for mental health benefits are prohibited under federal law. The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Act of 2008 prohibits health plans from applying "fail first" policies which require patients to fail first at a lower level of care before the health plan will approve benefits for a higher level of care. 29 C.F.R. § 2590.712(c)(4)(ii)(F).

### 3. "Severe Disability" is Not the Standard of Care

Blue Cross misstates the MCG Guidelines regarding severe behavioral health disorder. Blue Cross incorrectly states that the requirement is "severe disability" but the guideline actually states "severe disability *or disorder*." (AR0603). Blue Cross's requirement of "severe psychiatric symptoms," provides examples that have nothing to do with eating disorders (*i.e.* "hallucinations, delusions, other acute psychotic symptoms, mania, severe autistic behaviors") and is not the standard of

18

care for patients with eating disorders.

Blue Cross misstates the facts regarding Jessica's treatment. (*i.e.* Df's SUMF ¶ 16). Blue Cross omits the portion of the psychiatric notes which state: "*Insight and judgment are poor* and memory is intake." (AR1231) (emphasis added). Blue Cross actually *approved* benefits for every prior date of treatment based on the identical psychiatric progress notes. *i.e.* AR1216-1223.[1] Clearly, the psychiatric progress notes were irrelevant to Blue Cross's decision because Blue Cross approved and denied treatment based on the identical progress notes.

Blue Cross claims that Jessica's partial hospitalization was sufficient to "manage" her condition but this is the wrong standard. The standard of care is not to "manage" mental illness: "mental health treatment that only manages crises is not effective." *Id.* at *17. Even so, Jessica was not effectively managed or treated with 14 days of partial hospitalization. (AR0694, 703, 1636). During that time, she refused meals due to fear she would throw up. (AR0393). She had "ongoing urges to overexercise and restrict her food intake." (AR0393, 0391, 0389). She had "significant anxiety and nausea" during meals. *Id.* She required a structured meal

---

[1] Blue Cross complains that the record does not include psychiatric notes after August 17, 2015. (SUMF ¶ 16). Blue Cross never asked for additional psychiatric notes, as was its obligation under ERISA. 29 C.F.R. § 2560.503-1(g)(1)(iii). Blue Cross cannot now criticize the record for not including additional psychiatric notes which it never sought.

19

plan and constant monitoring to stabilize medically and maintain her weight. (AR0393, 0391, 0389, 1224-1225). Her heart rate was consistently orthostatic. (AR1225). Jessica was in the "preparation stage of change," and not yet initiated the changes necessary to break her reliance on the eating disorder.[2] (AR0311).

Blue Cross misstates Jessica's family relationships. Jessica struggled with family relationships at home. (AR1213). She "lied to her parents and used her sickness to continue to maintain her eating disorder." (AR1225). Blue Cross states that Jessica and her mother were "close" without elaborating that *the closeness of the relationship was forged in Jessica's illness*:

> The family has limited knowledge into the relationship between mind and body and have possibly contributed to her investment in the sickness role. Both Jessica and her mother have articulated that they value the closeness that Jessica's illness has given them. They both become tearful when discussing the possibility of wellness and fear the ways their relationship might change if Jessica were healthy. (AR1124).

### 4.    Jessica Required Structured Residential Level of Care

Jessica required residential treatment after June 15, 2015 because she had continual urges to self-harm, self-harmed while on pass and upon return to Avalon, could not consistently contract for safety, had urges to self-harm, was ambivalent

---

[2] https://www.nedc.com.au/eating-disorders/treatment-and-recovery/stages-of-change/

about recovery, and wanted to lose weight. Jessica could not utilize skills to

maintain a healthy weight because she had urges to restrict and would restrict when

she could "get away with it" at home, as she demonstrated during her home passes.

(AR0385, 1165, 1032). She returned from home passes at a lower weight.

(AR1165, 1104). She had ambivalence toward recovery. (AR1038, 1029, 1030,

1036, 1039).

The cases cited by Blue Cross are inapplicable. Both decisions in *Doe v.

Harvard Pilgrim Health Care, Inc.*, No. CV 15-10672, 2017 WL 4540961, at *11

(D. Mass. Oct. 11, 2017), *rev'd in part, vacated in part*, 904 F.3d 1 (1st Cir. 2018)

and *D. v. United Healthcare Ins. Co.*, No. 15CV1012 JM(BLM), 2016 WL

4072725, at *7 (S.D. Cal. Aug. 1, 2016), *aff'd sub nom. Kimberley D. v. United

Healthcare Ins. Co.*, 715 F. App'x 735 (9th Cir. 2018) did not adhere to the

standard of care for treatment of mental illnesses. The Court here must apply the

Plan requirement for the "general accepted standards of medical practice."

(AR0247). Both the court in *Doe* and *Kimberley D.* applied the UBH Guidelines

that have been deemed contrary to the standard of care for treatment of mental

illnesses. *See Wit*, 2019 WL 1033730 at *21-41. The question is whether treatment

was beneficial to Jessica: "the fact that a lower level of care may be less restrictive

does not justify moving the patient to that level of care if it is also likely to be less

effective in treating the patient's overall condition." *Wit*, at *29. Intensive

outpatient and partial hospitalization treatment were less effective in treatment

Jessica's overall condition.

**D.** **Jessica's Benefits Are Payable According to a Single Case Agreement Because Blue Cross Did Not Have Any Contracted Providers in Montana for the Requested Services**

Blue Cross's argument fails because (1) Blue Cross is precluded from presenting new arguments and evidence at trial; (2) Blue Cross agreed to pay according to a single case agreement; (3) The single case agreement between Blue Cross and Avalon in 2015 provided a rate of $1,150 per diem for residential treatment.

First, the new arguments and evidence presented by Blue Cross are inadmissible because they were not presented in response to Jessica's appeal. *See* Plaintiff's Motion to Strike; *Harlick v. Blue Shield of California*, 686 F.3d 699, 720 (9th Cir. 2012) (ERISA is undermined "'where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.'" (quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004)); *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 (9th Cir. 2010); *Nieves v. Prudential Ins. Co. of Am.,* 233 F. Supp. 3d 755, 764 (D.

Ariz. 2017).

Jessica's appeal directly addressed these issues (*i.e.* "We . . . need to negotiate a rate" and "requested a Single Case Agreement so [Avalon] can negotiate a rate and claims can be paid" and "A single case agreement needs to be completed so claims can be paid at a feasible rate to correspond with the level of treatment Jessica is receiving" and "the claims were paid at a very low reimbursement rate." (AR1327-1329). There is no support in the record for the reimbursement rates applied by Blue Cross and no explanation for how the rates were developed. Blue Cross does not have discretion to apply any rate it chooses for Jessica's treatment. Blue Cross had no providers in Montana for residential or partial hospitalization treatment of eating disorders and therefore did not have contracted rates for such services.

Second, when Blue Cross agreed to a single case agreement – which it did on February 24, 2015, February 25, 2015, May 8, 2015, July 1, 2015 (AR1329; JessicaU361-374) – it knew it was going to have to negotiate the rate to be applied. *See* Df's motion at fn 5 ("single case agreements are negotiated . . . to establish the rate" of reimbursement).

Third, the rates of a single case agreement are not set by Blue Cross, the rates are negotiated. Blue Cross negotiated other SCAs with Avalon in 2015.

23

(JessicaU361-362, 364-367). Blue Cross and Avalon negotiated a SCA with a rate of $1,150.00 per diem for residential treatment in 2015. (JessicaU366). On November 1, 2015, Avalon became an in-network provider with Blue Cross Blue Shield Association through the host plan, Regence Blue Cross and Blue Shield of Utah. (JessicaU361). The in-network provider contract between Avalon and Blue Cross also provides for a residential treatment rate of $1,150.00 per diem and a partial hospitalization treatment rate of $750.00 per diem. (JessicaU361-362).

The rate of reimbursement for Jessica's treatment is not a "distraction" for Jessica and her family. This is a very real patient who received substantial treatment that was not properly reimbursed by Blue Cross.

The case relied upon by Blue Cross is not relevant because the issue is not whether Blue Cross failed to follow its own procedures. *i.e. Nguyen v. Sun Life Assurance Co. of Canada*, No. 314CV05295JSTLB, 2015 WL 6459689, at *4 (N.D. Cal. Oct. 27, 2015). Jessica did not receive a full and fair review because Blue Cross violated ERISA procedures when it ignored Jessica's appeal. The larger issue is that Blue Cross's rate of reimbursement has no basis in the record. When challenged on appeal, Blue Cross had no response.

In conclusion, Jessica is entitled to a negotiated reimbursement rate pursuant to the single case agreement that was promised by Blue Cross.

24

**E.**     **The Court May Give Less Weight to Blue Cross's Decisions Based on Its Failure to Provide a Full and Fair Review**

In conducting a de novo review, the Court must weigh the evidence and decide how much weight to give to Blue Cross's decisions. *Todd R.*, 2019 WL 366225, at *2 (a de novo review involves "factual findings, evaluate credibility, and weigh evidence"). Although the Court owes no deference to Blue Cross under a de novo review, "the administrator's decision is still the decision under review. . . A showing that the administrator failed to follow ERISA procedures therefore provides a basis for reversal separate from that provided by de novo review of the merits of the claim." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832–33 (10th Cir. 2008) (*citing Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)); *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589, 593 (4th Cir. 2007) ("Under either standard of review—de novo or abuse of discretion—the administrator must comply with these procedural guidelines."); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993) (even under de novo review, administrator must "comply with ERISA and give reasons and not conclusions for its denial of claims.").

The cases cited by Blue Cross are not relevant to whether procedural violations may alter the weight the Court may apply to Blue Cross's decisions. The

25

case *Knopp v. Life Ins. Co. of N. Am.*, No. C-09-0452 CRB (EMC), 2009 WL 5215395, at *4 (N.D. Cal. Dec. 28, 2009) pertains to shifting the standard of review from abuse of discretion to de novo. That is not the issue before the Court.

Blue Cross did not give reasonable explanations for its denials. 29 C.F.R. § 2560.503-1(g)(1)(v)(B) and (j)(5)(ii) (plan "must provide "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."). Circuit courts "have warned plan administrators to provide '*specific reasons*,' rather than question-begging conclusions, to support their decisions." *Boyd v. Sysco Corp.*, No. 4:13-CV-00599-RBH, 2015 WL 7737966, at *14 (D.S.C. Dec. 1, 2015) (citing *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993) (emphasis in original)). Blue Cross's denial letters did not cite any provision of the plan. *Boyd*, 2015 WL 7737966 at *14 (denial letters are insufficient when they fail "to even refer to any specific plan terms on which the denial was based").

In its appeal denial, Blue Cross reiterated its previous denial without addressing any of the specific arguments, facts, or evidence submitted with Jessica's appeal. (AR0157-0158). Blue Cross did not reference any specific plan term. *Id.* The denial was not reasonable because it was factually inaccurate. Jessica did not have "several successful passes." (AR0158). While Jessica did have two

26

home passes in August and September, they did not go well, as explained above.

(AR1158, 1206). Blue Cross failed to explain how factors such as "no homicidal

intent, psychosis or physical aggression" were relevant to Jessica's treatment of her

diagnoses of eating disorder and anxiety. (AR0082). Blue Cross downplayed

Jessica's continued self-harm urges. *Id.* Blue Cross did not acknowledge Jessica's

refusals to sign a contract not to harm herself in treatment. *Id.*

Blue Cross never gave any indication as to why Jessica's appeal was

insufficient to substantiate her claim. *Lukas v. United Behavioral Health*, 504 F.

App'x 628, 630 (9th Cir. 2013) (directing judgment for claimant when insurer

failed to give "any indication as to why" the appeal letter was insufficient). Blue

Cross also did not advise Jessica what additional information was necessary to

perfect her claim. The phrase "based on clinical information" is hardly enough to

describe what Blue Cross sought to approve the claim.

Blue Cross did not investigate or conduct a thorough review of Jessica's

claims. Blue Cross's claim notes show that Dr. Thomas Allen completed a "chart

review on 6/10/16." (AR0081). The claim notes do not specify what Dr. Allen

reviewed from the lengthy appeal submission. (AR0082). The review only stated

that "existing clinical notes and relevant medical necessity criteria were reviewed."

(AR0082); *Boyd*, 2015 WL 7737966 at \*15 (denial letter fails to comply with

27

ERISA when it does not indicate what medical records were reviewed). The review did not reference any specific information from the appeal. *Id.* Dr. Allen was not provided the Plan or excerpts of Plan which was essential to determining whether benefits were payable under the Plan. *Boyd*, 2015 WL 7737966, at *12 (medical reviewer required the plan document which the reviewer "had the duty to interpret" under ERISA). The "review" does not state how much time Dr. Allen spent conducting his review. (AR0082). However, it is known that Dr. Allen was assigned the appeal the same day the denial letter was sent. (AR0082-0083, 0157).

### F.   <u>Plaintiff Seeks Proper Remedies</u>

As explained above, Blue Cross did not properly reimburse Jessica for her treatment at Avalon. The explanations provided by Blue Cross are too little, too late. The evidence offered by Blue Cross was never presented to Jessica during the appeal process and still does not explain how Blue Cross devised its rates. Blue Cross agreed to a single case agreement. Blue Cross delayed and ignored Jessica's requests for a proper reimbursement rate based on a single case agreement. Blue Cross now admits that it did not fully reimburse Jessica at its claimed rate of $525 per diem for residential treatment and instead reimbursed Jessica at the rate of $475 per diem. Blue Cross has never paid the full amount it now claims that it has owed Jessica since her treatment four years ago.

Plaintiff seeks prejudgment interest, attorney's fees and costs pursuant to ERISA. 29 U.S.C. § 1132(g)(1); *Acosta v. City Nat'l Corp.*, No. 17-55421, 2019 WL 1770032, at *8 (9th Cir. Apr. 23, 2019) (ERISA permits prejudgment interest to "ensure that an injured party is fully compensated for its loss."). Plaintiff will address the requested remedies when appropriate by separate motion.

## IV.    **Requested Relief**

Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment and enter summary judgment in her favor.


Dated this 10th day of May, 2019.      Respectfully Submitted,

By:  /s/ Elizabeth K. Green

Elizabeth K. Green (admitted pro hac vice)
Attorneys for Plaintiff
Jessica U.

## ***CERTIFICATE OF COMPLIANCE***

I certify that pursuant to Federal Rule 7.1(d)(2)(E) this brief uses a proportionately spaced typeface, and contains 6,493 words, excluding caption, certificates of services and compliance, table of contents and authorities, and exhibit index.

*/s/ Elizabeth K. Green*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2019 a true copy of the foregoing

PLAINTIFF'S RESPONSIVE BRIEF IN SUPPORT OF PLAINTIFF'S MOTION

FOR SUMMARY JUDGMENT was served via ECF on all parties of record.

Daniel J. Auerbach
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
201 West Railroad St. Suite 300
Missoula, MT 59802
Telephone: 406.728.1694
Facsimile: 406.728.5475
daniel@bkbh.com

Martin J. Bishop (*pro hac vice*)
Rebecca R. Hanson *(pro hac vice)*
Meredith A. Shippee *(pro hac vice)*
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
mbishop@reedsmith.com
rhanson@reedsmith.com
mshippee@reedsmith.com

*/s/ Elizabeth K. Green*

31