Michael D. Cok
Jonathan M. Cok
COK KINZLER PLLP
35 North Bozeman
P. O. Box 1105
Bozeman, Montana 59771-1105
Telephone: (406) 587-4445
mikecok@cokkinzlerlaw.com
jcok@cokkinzlerlaw.com

Elizabeth K. Green (pro hac vice)
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, CA 91324
Telephone: (818) 886-2525
egreen@kantorlaw.net

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA, BUTTE DIVISION

\* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| JESSICA U., | **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| v. | |
| | Civil Action No. 6:18-cv-00005 |
| BLUE CROSS AND BLUE SHIELD OF MONTANA, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      Introduction**

Defendant Blue Cross's response to Plaintiff Jessica U.'s motion for summary judgment fails to refute the valid reasons Jessica is entitled to summary judgment.

Blue Cross supplanted the Plan definition of medically necessary with guidelines which do not reflect generally accepted standards of medical practice. Blue Cross's reviewers were instructed to determine medical necessity based only on the MCG guidelines, not standards of medical practice. Blue Cross's reviewers were not provided the Plan language so they were incapable of even assessing whether benefits were payable under the Plan. Regardless of how many physicians Blue Cross paid to review Jessica's claim, when every physician applied guidelines which were contrary to the medical standards of care, every one of those opinions was flawed.

Blue Cross ignores credible evidence supporting Jessica's treatment and cherry picks Jessica's treatment records to shore up its vacuous denial. Jessica required residential treatment because she had urges to self-harm, self-harmed at Avalon, restricted food at home, was ambivalent toward recovery, and could not consistently commit to keeping herself safe.

Blue Cross breached its fiduciary duty by not responding to Jessica's appeal regarding the rate of reimbursement applied to her claims. ERISA imposes higher-than-marketplace quality standards on insurers such as Blue Cross. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115, 128 S. Ct. 2343, 2350, 171 L. Ed. 2d 299 (2008). Blue Cross was obligated to respond to Jessica's appeal. It failed to do so and has therefore waived the arguments it belatedly raises now.

In repeated telephone calls with Avalon, Blue Cross agreed to enter into a single case agreement with Avalon for Jessica's treatment. The evidence presented by Blue Cross for the first time at summary judgment is inadmissable and fails to acknowledge the single case agreement promised for Jessica's treatment.

## II. Factual Background

Plaintiff addressed the facts presented by Blue Cross in Plaintiff's response to Blue Cross's motion for summary judgment (ECF No. 56). To avoid repetition, Plaintiff refers the Court to Plaintiff's prior response. *Id.* Plaintiff highlights the following disputed facts.

### A. The MCG Guidelines Do Not Satisfy the Plan Requirements

The Plan does not authorize Blue Cross to "use" the MCG Guidelines to determine medical necessity. (AR0172-0276). Blue Cross's only authority for its right to "use" the guidelines is a citation to its own letters.

The MCG guidelines are inapplicable because they were not incorporated or referenced in the ERISA plan and do not satisfy the Plan definition for "medically necessary" which requires treatment "in accordance with generally accepted standards of medical practice" which means "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the view of Physicians practicing in relevant clinical areas and any other relevant factors." (AR0247). There is no evidence as to how the MCG guidelines were developed. As explained below, the MCG Guidelines are contrary to the standard of medical practice.

### B. Blue Cross Misquotes the MCG Guidelines

Blue Cross repeatedly misquotes the MCG guidelines in its responsive brief and its Statement of Disputed Facts (ECF Nos. 60, 61). For example, Blue Cross misquotes the MCG residential guidelines as stating, "A patient is stabilized and requires structured setting . . . ." (ECF No. 61 at p. 65). The guideline is correctly quoted as, "Patient currently has stabilized during inpatient treatment stay <u>for severe symptoms or behavior</u> and requires structured setting . . . ." (AR0603) (emphasis added to show omission by Blue Cross). Plaintiff contends that the MCG guidelines are inapplicable to Jessica's claims, but it is important to quote them

3

correctly.

## C. Jessica's Home Passes Were Not "Successful" Or "Without Incident"

The record does not support Blue Cross's characterization that Jessica's home passes were "successful" and "without incident." During her first home pass from June 6-14, 2015, Jessica restricted meals on her home pass, struggled with family, and admitted "continual urges to harm self" and self-harmed at home. (AR0087, 0169, 1213). She self-harmed upon return to Avalon by excessively rubbing her wrists to the point of creating a burn mark on her wrists. (AR0069, 0385).

During her second home pass from July 17-31, 2015, Jessica restricted 5-6 times when "she had the opportunity to get away with it." (AR1032, 1108), threw away her dinner (AR1108), had strong self-harm urges (AR1033), and lost weight (AR1165).

During her third home pass from August 21, 2015 to September 4, 2015, Jessica reported "she didn't 'do too well' with fluids" (AR1158), "restricted food on her pass and that she struggled with getting her food intake" (AR1158), "had a 'challenging' pass" (AR1139), "doesn't feel the pass went very well at all" (AR1158), and lost 1.5 pounds. (AR1104).

4

## III. Plaintiff's Response to Defendant's Arguments

### A. The MCG Guidelines Do Not Reflect the Generally Accepted Standards of Medical Practice

Blue Cross's defense of the MCG guidelines is untenable because the record contains no evidence to suggest that the MCG guidelines reflect the generally accepted standards of medical practice. Blue Cross simply saying so does not make it so. The cases cited by Blue Cross do not provide any analysis as to whether the MCG guidelines reflect the generally accepted standards of medical practice. Blue Cross claims the MCG guidelines are "industry standard." Jessica's benefits are not based on an insurance industry standards, Jessica's benefits are based on the Plan which require scientific evidence and medical literature.

### B. *Wit v. United Behavioral Health* is Directly On Point in Setting Forth the Generally Accepted Standards of Medical Practice for Patients With Mental Illness

The decision *Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019) provides an extensive analysis of the generally accepted standards of medical practice for mental illness and residential treatment specifically. *Id.* at *17 ("The Court finds, by a preponderance of the evidence, that the following standards are generally accepted in the field of mental

5

health . . . treatment and placement."). It is irrelevant whether *Wit* considered the MCG guidelines because Jessica's Plan requires medical necessity in accordance with generally accepted standards of medical practice, not the MCG guidelines.

Blue Cross complains that the *Wit* decision did not specifically analyze eating disorder treatment. This is short sighted. The *Wit* decision analyzed the standards of medical practice for residential treatment of patients with any mental illness. Jessica suffered from multiple mental illnesses, including anorexia nervosa and generalized anxiety disorder, both of which contributed to her need for residential treatment. (AR0331). The *Wit* decision points out that co-occurring disorders "can interact in a 'reciprocal way' that makes each of them 'worse.' . . . Because co-occuring disorders can aggravate each other, treating any of them effectively requires a comprehensive, coordinated approach to all conditions." *Id.* at *18. The MCG guideline offer no allowances for treatment of patients with co-occuring disorders.

Like the UBH guidelines, the MCG are proprierty guidelines.[1] Unlike the UBH guidelines, the MCG guidelines are not available to the public.[2] The MCG guidelines were not created for treating providers, they were created to reduce costs of the insurers and administrators who purchase the guidelines. Blue Cross does not dispute that MCG editors include an actuary who by definition is tasked with

---

[1] https://www.mcg.com/licensing-terms/
[2] *Id.* ("Posting of the care guidelines or any portion thereof on a public website is not permissible.").

calculating financial risk.

MCG discourages the use of its guidelines for medical decisions: "The care guidelines do not constitute procedures for the practice of medicine . . ."[3] Yet Blue Cross applied the MCG guidelines to make medical recommendations about Jessica's treatment. Blue Cross determined that based on the MCG guidelines, Jessica did not qualify for residential treatment and could have been treated in intensive outpatient treatment. Blue Cross impermissibly provided treatment recommendations when none of its physicians ever examined Jessica. *Id.*

The MCG guidelines were mandatory for Blue Cross medical reviewers. Each Blue Cross medical reviewer specifically based his decision on the MCG guidelines and *only the MCG guidelines*. Blue Cross's argument that its reviewers referred to the MCG guidelines as a "clinical support tool" is backpedaling. The record confirms that no other resources were referenced or cited by Blue Cross's reviewers.

There is no evidence that Blue Cross reviewers applied their own medical judgment. The reviewers had no face to face evaluation of Jessica. There is no evidence that the reviewers had experience treating patients with eating disorders. The decisions by Blue Cross reviewers are entitled to less weight than the recommendations of Avalon physicians who evaluated Jessica daily and specialized

---

[3] https://www.mcg.com/terms-of-use/

in the treatment of patients with eating disorders. *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, No. C17-1041JLR, 2019 WL 366225, at *16 (W.D. Wash. Jan. 30, 2019), *reconsideration denied*, No. C17-1041JLR, 2019 WL 1923034 (W.D. Wash. Apr. 30, 2019) (court places greater weight on the treating physician who examined the patient); *Smith v. Hartford Life & Acc.*, No. C 11-03495 LB, 2013 WL 394185, at *23 (N.D. Cal. Jan. 30, 2013) ("Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question."); *Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006) ("exclusive reliance on second-hand opinions adds to the overall picture of its decision as less than fair").

The MCG guidelines and Blue Cross's denials improperly focus on "imminent" problems, *i.e.* "not at immiment risk of harm." (AR0158). The MCG guidelines and Blue Cross's denials improperly recommend discharge when a patient can be "managed" at a lower level of care even though the patient cannot also be effectively treated at the lower level of care. *Id.*; *Wit*, 2019 WL 1033730 at *32;

The MCG guidelines do not address eating disorders. None of the 32 articles cited in the footnotes to the MCG guidelines pertain to eating disorders.[4] All of the

---

[4] Only 12 of the MCG referenced articles could possibly be relevant to Jessica. The other 20 articles address irrelevant factors such as veterans, psychosis, and violence. (AR0605-0606).

765 articles cited in the APA Guideline for Eating Disorders pertain to eating disorders.[5] The MCG guidelines reference only the APA guideline for substance abuse. (AR0606). The MCG guideline do not reflect the ASAM guidelines which provides for the less restrictive level of care "that is effective." *Wit*, 2019 WL 1033730, at *18.

Acute symptoms may necessitate residential treatment but the MCG guidelines focus on acute symptoms to the exclusion of treating the patient's underlying condition. If, as Blue Cross contends, the MCG guidelines require improvement of <u>all</u> symptoms prior to discharge from residential treatment then Blue Cross should have approved benefits because Jessica did have improvement of all symptoms when Blue Cross recommended her discharge from residential treatment.

### C. Jessica Satisfied the MCG Guidelines

Nothwithstanding the inapplicability of the MCG guidelines, Jessica satisfied the MCG guidelines and specifically the sixth prong: "Patient currently has stabilized during inpatient[6] treatment stay for severe symptoms or behavior and requires structured setting with continued around-the-clock behavioral care."

---

[5] https://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/eatingdisorders.pdf
[6] Inpatient and residential treatment are interchangeable in this reference. *Todd R.*, 2019 WL 366225, at *13.

(AR0603). An analysis of this sixth prong is found in the decision *Todd R.*, 2019 WL 366225, at *12. In *Todd R.*, the court ruled that it did not have to determine what medical standards to apply because the patient satisfied the MCG guidelines. *Id.* The Court held that the patient's self-harm urges and inability to consistently commit to her safety in treatment supported medical necessity under the sixth prong. *Id.* at *15. Likewise here, Jessica's urges to self-harm and an inability to consistently commit to her safety supports medical necessity under the sixth prong.

Blue Cross improperly equates some improvement with not medically necessary. Jessica's tenuous improvement does not mean residential treatment was not medically necessary. As one court explained, "the mere incidence of some improvement does not mean treatment was no longer medically necessary. For instance, just because Plaintiff reported having a positive time with her parents on September 1 . . . does not mean that her parent-child issues no longer necessitated the same level of care." *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 833 (N.D. Ill. 2019). Similarly, some improvements did not mean residential treatment was no longer medically necessary for Jessica. For example, while Jessica could contract for safety on some occasions, she could not consistently contract for safety, as demonstrated by this treatment note in July 2015: "She has been on multiple clinical watches over the past several weeks due to self-harm thoughts which she was reporting frequently. Jessica was unable to contract for safety

10

multiple times during this time." (AR1114).

Plaintiff's lawsuit challenges the medical necessity denial of her residential treatment, not partial hospitalization. Nonetheless, the same reasons provided in Plaintiff's briefs regarding her need for residential treatment apply to partial hospitalization. Blue Cross application of specific eating disorder guidelines to Jessica's partial hospitalization treatment, but not to Jessica's residential treatment, reflects a lack of consistency in claims review.

Blue Cross's argument that Jessica should have attempted a lower level of care is incorrect. First, Jessica attempted partial hospitalization and it was not successful (*i.e.* AR0391, 0393, 0389). Second, it is improper to require patients to fail first at a lower level of care before approving a higher level of care. So-called "fail first" policies for mental health benefits are prohibited under federal mental health parity laws. 29 C.F.R. § 2590.712(c)(4)(ii)(F).

## D. The Court May Give Less Weight to Blue Cross's Decisions Based on Blue Cross's Disregard of Its Obligations as an ERISA Fiduciary

Although the Court owes no deference to Blue Cross under a de novo review, "the administrator's decision is still the decision under review. . . A showing that the administrator failed to follow ERISA procedures therefore provides a basis for

reversal separate from that provided by de novo review of the merits of the claim." *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832–33 (10th Cir. 2008) (*citing Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)); *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589, 593 (4th Cir. 2007) (under either standard of review, "the administrator must comply with these procedural guidelines."); *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993) (even under de novo review, administrator must "comply with ERISA and give reasons and not conclusions for its denial of claims.").

Blue Cross consistently disregarded its obligations as an ERISA fiduciary. First, Blue Cross was obligated to follow the terms of the ERISA Plan, not replace the Plan with guidelines of its own choosing. *Florence Nightingale Nursing Service, Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1483-1484 (11th Cir. 1995), *cert. denied*, 514 U.S. 1128, 115 S.Ct. 2002, 131 L.Ed.2d 1003 (1995) (abuse of discretion to apply Blue Cross's guidelines in place of the plan's "medically necessary" definition); *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 459 (9th Cir. 1996) ( "an administrator lacks discretion to rewrite the Plan," citing *Florence*).

Second, Blue Cross was obligated by ERISA to respond to Jessica's appeal. 29 C.F.R. § 2560.503–1(i); *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1107 (9th Cir. 2003). Blue Cross never

responded to Jessica's appeal regarding the rate of reimbursement and single case agreement.

Third, Blue Cross was obligated to fully review and explain its response to Jessica's appeal. 29 C.F.R. § 2560.503-1(g)(1)(v)(B) and (j)(5)(ii) (plan "must provide "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."); *Glenn*, 554 U.S. at 115 (ERISA "underscores the particular importance of accurate claims processing by insisting that administrators 'provide a "full and fair review" of claim denials'").

Blue Cross did not fully review Jessica's appeal or provide reasonable explanations for denials. (*i.e.* AR0157). Circuit courts "have warned plan administrators to provide '*specific reasons*,' rather than question-begging conclusions, to support their decisions." *Boyd*, 2015 WL 7737966, at *14 (D.S.C. Dec. 1, 2015) (citing *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993) (emphasis in original)). Blue Cross's denial letters did not cite any provision of the plan. *Boyd,* 2015 WL 7737966 at *14 (denial letters are insufficient when they fail "to even refer to any specific plan terms on which the denial was based").

Blue Cross claims it need not annotate every paragraph of the medical record, yet Blue Cross made no attempt to address any of the arguments, facts, or evidence

13

submitted with Jessica's appeal. (AR0157-0158). Blue Cross got the facts wrong in its denials which suggests a less than thorough review. For example, Jessica did not have "several successful passes." While Jessica had two home passes during residential treatment, they did not go well, as explained above.

Blue Cross never gave any indication as to why Jessica's appeal was insufficient to substantiate her claim. *Lukas v. United Behavioral Health*, 504 F. App'x 628, 630 (9th Cir. 2013) (directing judgment for claimant when insurer failed to give "any indication as to why" the appeal letter was insufficient). Blue Cross also did not advise Jessica what additional information was necessary to perfect her claim.

### E. **Blue Cross Has Waived Arguments Regarding the Reimbursement Rate and Single Case Agreement**

Four years ago, Blue Cross decided that it would not respond to Jessica's appeal regarding the single case agreement and reimbursement rate. Blue Cross has waived its arguments because the arguments should have been presented to Jessica four years ago. *See* Plaintiff's Motion to Strike at ECF No. 59.

Blue Cross claims that it was justified in ignoring Plaintiff's appeal because "the appeal was not submitted by Plaintiff." (*See* ECF No. 61 at p. 52). This is

14

incorrect. The appeal was submitted on the Blue Cross *Member Appeal Form*[7] and signed by Jessica's authorized representative. If Blue Cross was concerned that Jessica's appeal did not qualify as an appeal in 2015, Blue Cross was *obligated to inform Jessica of its concerns in 2015*. "There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters." *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). Instead, Blue Cross chose silence, only to criticize Jessica's appeal four years later.

Even if considered, Blue Cross's arguments fail to acknowledge that Blue Cross agreed, on multiple occasions, to a single case agreement with Avalon. Blue Cross should be held to its promise of a single case agreement and the evidence provided by Jessica demonstrates the rate of a single case agreement between Blue Cross and Avalon.

### F. Plaintiff Seeks Proper Remedies

Plaintiff seeks prejudgment interest, attorney's fees and costs pursuant to ERISA. 29 U.S.C. § 1132(g)(1); *Acosta v. City Nat'l Corp.*, No. 17-55421, 2019 WL 1770032, at *8 (9th Cir. Apr. 23, 2019) (ERISA permits prejudgment interest to "ensure that an injured party is fully compensated for its loss."). Plaintiff will

---

[7] The identical Member Appeal Form is still provided on Blue Cross Blue Shield of Montana's website. https://www.bcbsmt.com/pdf/forms/appeal-review-form-member.pdf

address the requested remedies when appropriate by separate motion.

## IV.  **Requested Relief**

Plaintiff respectfully requests that the Court enter summary judgment in her favor.


Dated this 24th day of May, 2019.     Respectfully Submitted,

                        By:  /s/ Elizabeth K. Green
                             Elizabeth K. Green (admitted pro hac vice)
                             Attorneys for Plaintiff
                             Jessica U.

## ***CERTIFICATE OF COMPLIANCE***

I certify that pursuant to Federal Rule 7.1(d)(2)(E) this brief uses a proportionately spaced typeface, and contains 3,219 words, excluding caption, certificates of services and compliance, table of contents and authorities, and exhibit index.

*/s/ Elizabeth K. Green*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2019 a true copy of the foregoing PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT was served via ECF on all parties of record.

Daniel J. Auerbach
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
201 West Railroad St. Suite 300
Missoula, MT 59802
Telephone: 406.728.1694
Facsimile: 406.728.5475
daniel@bkbh.com

Martin J. Bishop (*pro hac vice*)
Rebecca R. Hanson *(pro hac vice)*
Meredith A. Shippee *(pro hac vice)*
REED SMITH LLP
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
mbishop@reedsmith.com
rhanson@reedsmith.com
mshippee@reedsmith.com

*/s/ Elizabeth K. Green*