IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JESSICA U., | Cause No. CV 18-05-H-CCL |
| Plaintiff, | |
| vs. | ORDER |
| HEALTH CARE SERVICE CORPORATION d/b/a BLUE CROSS AND BLUE SHIELD OF MONTANA, | |
| Defendant. | |

This matter is a coverage dispute arising under 29 U.S.C. § 1132 of the Employment Retirement Income Security Act of 1974 ("ERISA"), which is a "comprehensive statue designed to promote the interest of employees and their beneficiaries in employee benefit plans."  *See Shaw v. Delta Air Lines*, 463 U.S. 85, 90-91 (1983).  Plaintiff's Amended Complaint seeks review of Defendant's denial of health insurance benefits alleged to be due to her under the plan.  Before the Court are cross-motions for summary judgment.  The parties have stipulated that the standard of review is de novo, (*see* Doc. 26 at 3-4), the Court finds the matter is appropriate for determination without a hearing.

**Background**

Plaintiff Jessica U. ("Jessica") was a dependent beneficiary of an employee group health plan made available to her through her father's company, Amatics

CPA Group ("Amatics").  Defendant Health Care Service Corporation, operating in Montana as Blue Cross Blue Shield of Montana ("BCBS"), issued the group health plan ("the plan") to Amatics. After her claim was denied, Jessica appealed administratively and has exhausted her administrative remedies.  The plan issued by BCBS does not grant BCBS discretion to construe plan provisions or interpret plan terms.  The parties therefore agree that a de novo standard of review applies in this action.

**Legal Standards**

I.      **Medical Necessity of Treatment**

Summary Judgment

The moving party must inform the court of the basis for the motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment should be granted if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56( c), Fed. R. Civ.P. An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence…will be insufficient; there must be evidence on which a jury could reasonably find for the [nonmoving party]." *Id*. at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the

nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id*., at 255.  Where a defendant moves for summary judgment on a claim for which the plaintiff has the burden of proof, the defendant may prevail simply by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp*., 477 U.S. at 322.

"On summary judgment, the proper task is not to weigh conflicting evidence, but rather to ask whether the non-moving party has produced sufficient evidence to permit the fact finder to hold in his favor."  *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transfrerred GE Operations*, 244 F. 3d 1109, 1114 (9th Cir. 2001).  Because there is no right to a jury trial in ERISA cases, a bench trial confined to the administrative record, before a district judge who has already ruled on summary judgment would be "little more than a formality."  *Id*. at 1114.  At a bench trial, the district court can admit additional evidence if "circumstances clearly establish that [it] is necessary to conduct an adequate de novo review of the benefit decision. *Id*. (quoting *Mongeluzo*, 46 F. 3d at 944).  In this case, neither party gives any indication of having any additional evidence to offer.  Both parties seek summary judgment on the existing administrative record and assert there are no genuine issues of material fact.

3

Review of Denial of ERISA benefits

ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)(ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.").

A claim of denial of benefits in an ERISA case "is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). Here there is no dispute that a de novo standard of review applies.  Under a *de novo* standard of review, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F. 3d 955, 963 (9th Cir. 2006).  The court's review is generally limited to the evidence contained in the administrative record.  *Opeta v. NW Airlines Pension Plan for Contract Employees*, 484 F. 3d 1211, 1217 (9th Cir. 2007).[1]

---

[1] A non-exhaustive list of circumstances clearly establishing the need for evidence beyond the administrative record include complex medical questions, little or no evidentiary record, need for evidence regarding plan interpretation, impartiality issues when the administrator is the payor,

"Under de novo review, the rules ordinarily associated with the interpretation of insurance policies apply." *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc*., 125 F. 3d 794, 799 (9th Cir. 1997). Accordingly, the court construes any ambiguities in the Plan against BCBS and is required "to adopt [a] reasonable interpretation advanced by [the insured]." *See Lang*, 125 F. 3d at 799.

The claimant seeking to clarify a right to benefits under the terms of the plan carries the burden of proof, and she must establish her entitlement by a preponderance of the evidence. *See Muniz v. Amec Const. Management, Inc*., 623 F. 3d 1290, 1294 (9th Cir. 2010)(citing *Horton v. Reliance Standard Life Ins. Co*., 141 F. 3d 1038, 1040 (11th Cir. 1998); *see also Richards v. Hewlett-Packard Corp*., 592 F. 3d 232, 239 (1st Cir. 2010). Under the de novo standard of review, "the court does not give deference to the claims administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is [entitled to benefits] under the terms of the plan." *Muniz*, 623 F. 3d at 1295-96.

/ / /

---

traditional insurance contract claims prior to ERISA, and circumstances in which there is additional evidence that the claimant could not have presented in the administrative process. *Opeta*, 484 F. 3d at 1217 (quoting *Quesinberry v. Life Ins. Co. of North America*, 987 F. 2d 1017, 1025 (4th Cir. 1993)(en banc).

In *Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999), the Ninth Circuit indicated that, where there is an ERISA dispute, a trial based on the administrative record alone may be conducted.  In a trial on the record, but not on summary judgment, [a] judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id*. at 1095.

**Facts**

From March 16, 2015 to May 21, 2015, Jessica was in residential treatment ("RTC") at Avalon.  At the time of her admission, Jessica was 16 years old.  She was admitted to RTC upon the recommendation of her outpatient treatment team in Bozeman, Montana, for failure to make progress toward recovery at other levels of care and due to a lack of specific eating disorder focused services in her home area. (AR0340).

Jessica had a complicated history of gastric distress and illness that preceded her admission by at least four years.  In 2011, due to her gastric distress, Jessica's gall bladder was removed and multiple endoscopies were performed.  (AR0284). Jessica was then diagnosed with collagenous gastritis, "which is where collagen bands are formed in the stomach that don't allow the food to move through." *Id*. Correspondingly, Jessica suffered from constant nausea.  In 2013, Jessica was prescribed prednisone which led her to gain 20 pounds in a short period of time. (AR340).  The weight gain was highly distressing to Jessica and, as result, she

began changing her diet and exercise routines. Her food restriction and over

exercise behaviors increased steadily from that point forward. *Id.* Jessica's

behaviors during this time period, however, were not conceptualized as eating

disorder related or resulting from psychological distress, but rather were tied

instead to her ongoing nausea and gastric problems. *Id.*

In 2014, Jessica had a gastric pacemaker put in which acted as a stimulator

to assist food in moving through her GI tract. *Id.* In December of 2014, Jessica

had a Jpeg, or feeding tube installed. (AR0284). This device was only used for

approximately 1 month, however, because when she was receiving calories

through the feeding tube, Jessica refused to eat. (AR0338). Additionally, in an

effort to manage Jessica's "gastric and somatic complaints" she had her tonsils

removed, her adenoids removed, and was prescribed birth control for her nausea.

(AR0340). Upon admission to Avalon it was noted that Jessica had been routinely

treated by medical providers who did not have expertise in treating eating

disorders. *Id.*

During this same four-year period, Jessica also missed a significant amount

of school. Upon arrival at Avalon, admitting therapist, Dr. Sara Boghosian, noted it

was "unclear of how much of [the school absence] is related to avoidance and/or

somatic complaints versus true medical concerns at this time." (AR0341). Jessica

attempted to return to school on several occasions, but was not able to do so due to

her high anxiety, which included panic attacks.  Accordingly, Jessica had been homeschooled.  *Id*.

Upon admission Jessica met criteria for Anorexia Nervosa, Restricting Type and Generalized Anxiety Disorder (GAD).  (AR0342). Additionally, Major Depressive Disorder could not be ruled out, with the admitting therapist noting Jessica had had at least one depressive episode in her life, and there was evidence of ongoing problems in this area.  *Id*.  Of particular concern in relation to Jessica's treatment was her lack of insight into the psychological components of her medical issues.  *Id*.  This lack of insight and connection also delayed Jessica's identity development and she "appear[ed] to have avoidant/dependent personality characteristics that lead her to over-identify with the sickness role." *Id*.  Upon admission, Jessica was 5'2.25" and weighed 92.2 pounds. (AR 1069).

On March 30, 2015, a BCBS representative inquired about the estimated length of Jessica's stay at Avalon.  Avalon advised they operate under a model of "treat to outcome" and that the length of stay varies individual to individual. (AR0500).  Of particular concern to Avalon providers was the interwoven nature of Jessica's physiological health/gastric issues and her eating disorder and the fact that Jessica and her family holding on to the idea that Jessica was someone who was chronically ill.  (AR0499).

/ / /

8

BCBS initially approved residential treatment from March 15, 2015 to May 19, 2015.[2]  Subsequently, BCBS approved benefits for two additional days of residential treatment through May 21, 2015.  (AR 0152).

On May 22, BCBS denied further benefits for residential treatment; Jessica transitioned into Avalon's partial hospitalization ("PHP") program.  (AR 0490-491, 0694).  Jessica's treatment team at Avalon had anticipated Jessica would engage in a series of passes outside of Avalon, and if she did well, would step down to PHP.  See e.g., (AR0016).  On June 6, Jessica went home to Bozeman on a 1-week therapeutic pass.  Jessica had some struggles on the pass which resulted in an increase in self-harm urges.  Upon return to Avalon, her urges became so strong that she engaged in self-harm by rubbing her wrist and creating a burn mark. (AR0308).  Due to the risk of self-harm ideation and self-harm behavior, Jessica was placed on quarter hourly clinical watch.  *Id*.  Jessica also was admitted back into RTC, rather than remaining at the lower PHP level of care.

BCBS denied Jessica further treatment. It is unclear exactly why, but the request for treatment in June of 2015 was made for PHP, when Jessica was actually back in RTC.  Nevertheless, BCBS denied treatment. Jessica remained in RTC at Avalon for the summer of 2015.[3] Jessica discharged on September 10, 2015.

---

[2] On April 29, 2015, Dr. Rasik Lal determined Jessica did not qualify for continued RTC care. (AR0027). On May 1, 2015, Dr. Heldings, overturned Dr. Lal's denial on appeal.  (AR0024).
[3] The specifics of Jessica's summer 2015 treatment are discussed in further detail below.

On October 19, 2015, Jessica submitted her first level appeal for post service review to BCBS for the summer 2015 RTC. (AR0154); (AR0087-88).  On November 9, 2015, a post service review was performed.  Upon review of the records, Dr. Timothy Stock denied the request for benefits for Jessica's summer 2015 treatment, finding she did not meet the Milliman Care Guidelines ("MCG")[4] for admission to RTC; the appropriate level of care was intensive outpatient ("IOP"). (AR0167).

On May 6, 2016, Jessica submitted her first level appeal from denial of benefits.  (AR0502-16).  On June 10, 2016, Dr. Thomas Allen completed a chart review and denied coverage.  Dr. Allen also found Jessica did not meet the MCG for RTC:

> She was not at imminent risk of harm to herself or anyone else.  She had no behavioral dysregulation that required around-the-clock care.  She had no severe impairment in functioning.  She had no acute medical issues.  Her weight remained stable, and she was at 100% of her ideal body weight.  She had no instances of purging or other serious eating disorder behaviors that could not be managed as a lower level of care.  She was adherent with her meal plan.  Her family was supportive, and she had several successful passes outside of the facility without incident.  Ongoing treatment to address this patient's psychiatric symptoms and eating disorder behaviors could reasonably have been addressed to a less restrictive environment, for example IOP.

(AR0082-3). Based on Dr. Allen's application of the MCG, Jessica was advised that the requisite "medical necessity" under the plan was not met. (AR0158).

---

[4] The MCG are discussed in greater detail below.

**Medical Necessity**

The plan covers residential treatment and partial hospitalization as long as those services are deemed "medically necessary," which is defined as:

> Health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that are:
>
> 1. in accordance with generally accepted standards of medical practice;
>
> 2. clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease; and
>
> 3. Not primarily for the convenience of the patient, Physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the view of Physicians practicing in relevant clinical areas and any other relevant factors.
>
> The fact that services were recommended or performed by a Covered Provider does not automatically make the services Medically Necessary. The decision as to whether the services were Medically Necessary can be made only after the Member receives the services, supplies, or medications and a claim is submitted to The Plan.  The Plan may consult with Physicians or national medical specialty organizations for advice in determining whether services were Medically Necessary. (AR0247).

Under the terms of The Plan, anorexia nervosa constitutes a mental illness.

(AR0248).  When making the determination whether Jessica's mental health treatment was medically necessary, BCBS utilized the MCG.  While the plan allows for BCBS to consider "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the view of Physicians practicing in relevant clinical areas and any other relevant factors," in making a determination of "medical necessity," *see* (AR0899), the MCG themselves are not referenced or incorporated into the plan. (AR0172-0276).

BCBS argues that Jessica's summer 2015 RTC treatment was not medically necessary based upon application of the MCG.  (Doc. 46 at 17-24.)  Specifically, citing to the MCG, BCBS argues Jessica was not in imminent danger to herself or others, had no issues with self-care, had no severe disability requiring acute residential intervention, had no co-morbid substance abuse disorder, and did not require a structured setting with continued around-the-clock care.  *Id*.; see also, MCG, Residential Acute Behavioral Health Level of Care, Child or Adolescent, 19th Edition 2015. (AR0602-07).

Relying in part upon *Wit v. United Behavioral Health*, 2019 WL 1033730, at *20 (N.D. Cal. Mar. 5, 2019), Jessica asserts the MCG do not represent, and, in fact are more restrictive than, generally accepted standards of medical care. (Doc.55 at 22-27.)  In *Wit*, plaintiffs filed a class action suit alleging they were

12

improperly denied benefits for treatment of mental health and substance use disorders because United Behavioral Health's ("UBH") Guidelines did not comply with the terms of their insurance plan.  Following a 10-day bench trial, the court found UBH was liable to the class under ERISA for its breach of fiduciary duty and for its arbitrary and capricious denial of benefits. *Wit*, 2019 WL 1033730 at *51-55.[5]

Jessica argues the MCG improperly focus on acute symptoms and presenting problems, rather than the effective treatment of the patient's overall condition and that treatment aimed only at managing crises is not effective. *Id*. at 24, citing *Wit*, 2019 WL 1033730 at *17 (noting factors that focus on "acute," "severe," or "imminent" symptoms deviate from generally accepted standards of care.") Jessica also argues the MCG permit denial of residential treatment if behaviors could be "adequately monitored" at a lower level of care, but that this requirement is contrary to the standards of care because those with chronic conditions, improvement "includes services to maintain function." *Id*. at 25, citing *Wit*, at *32. Jessica argues that if a patient can only be adequately monitored at a lower level of care, but cannot improve or maintain function, a higher level of care should be provided.  *Id*.  Additionally, Jessica notes the MCG are not specific to eating

---

[5] As set forth above, this Court is operating under a *de novo* standard of review, not an arbitrary and capricious standard.

disorders, but rather apply to any mental illness, rendering them virtually irrelevant to eating disorders. Jessica notes factors such as "command auditory hallucinations" and "risk for homicide" are unhelpful in assessing her disorder. *Id.* Also, Jessica asserts the MCG seek treatment to be successful within a certain time period, when generally accepted standards of care dictate that the duration of treatment should be based upon the individual patient's specific illness, needs, history, treatment goals, and response. *Id.* at 26, citing *Wit*, at *20, 31.

BCBS argues *Wit* is inapplicable to the present case because it does not examine medical necessity criteria for eating disorder treatment and contains no analysis of the MCG. (Doc. 60 at 15.) Additionally, BCBS claims *Wit* addressed internal propriety guidelines for mental health and substance abuse created by UBH, not an industry-standard nationally recognized clinical support tool, like the MCG. *Id.* In response to Jessica's argument that in using the MCG in his denial of benefits that Dr. Allen did not reference credible scientific evidence or peer-reviewed literature, BCBS argues the MCG are an industry standard clinical decision support tool that cite 32 different scientific articles and medical literature relied upon when Milliman created the guidelines. *Id.* at 16; see also (AR0605-6). These guidelines include ASAM and the APA guidelines, accordingly, the generally accepted standard of care was applied. *Id.* In relation to Jessica's argument about the overemphasis on acute symptoms in the MCG, BCBS argued

this statement was wrong because the MCG do not require the presence of acute symptoms for patient admission to RTC.  BCBS points out one of the criteria for residential treatment under the MCG is that the patient has stabilized during inpatient treatment for severe symptoms or behavior and requires structured setting with continued around-the-clock behavioral care.  *Id*.  Additionally, unlike *Wit*, the MCG do not focus on presenting problems but require that "adequate response...to planned treatment is expected within a limited time period."  *Id*. at 17-18.  Thus, the MCG do not focus solely on expected improvement in presenting acute symptoms, but rather require expected improvement from a residential treatment center's planned treatment for all of a patient's symptoms.  *Id*. at 18.  BCBS also argues that the MCG's consideration of whether behavior can be adequately monitored at a lower level of care is consistent with the generally accepted standard of care.  *Id*.  In response to the argument that the MCG is not specific to eating disorders, BCBS argues that Jessica did not meet the eating-disorder-specific MCG for partial hospitalization in June of 2015, thus, it stands to reason that she would not have met the request for admission to a higher level of RTC care.  *Id*. at 19.  Accordingly, BCBS asserts the lack of specificity of the MCG for residential treatment for eating disorders has no bearing in the present matter.  *Id*.

But the Court finds problems with BCBS's argument.  As a preliminary matter, despite BCBS's claim that the MCG was just a tool for the administrators

evaluating Jessica's case and that the MCG themselves encompassed generally

accepted standards of care, particularly relative to eating disorders, the record

reveals something different.  Of the 32 articles cited by the applicable MCG, not

one specifically addresses eating disorders.  See (AR0605-6).  Rather a broad array

of topics are covered with a seeming focus on acute hospitalizations and patient

stabilization, including: acute psychiatric hospitalization; addiction/substance

abuse/co-occurring disorders; suicide/depressive disorders; acutely psychotic

patients/psychiatric disorders; violent patients; psychiatric emergencies/involuntary

admission/crisis stabilization; obsessive compulsive disorder; delirium/dementia;

developmental disorders; and, adolescent residential treatment.  *Id*.

On June 6, 2016, Dr. Thomas W. Allen performed a paper review of

Jessica's first level member appeal. (AR0082-83). The appeal was denied because

Jessica failed to meet criteria for RTC based on MCG care guidelines: "She was

not at imminent risk of harm to herself or anyone else.  She had no behavioral

dysregulation that required around-the-clock care.  She had no severe impairment

in functioning. She had no acute medical issues. Her weight remained stable and

she was at 100% of her ideal body weight. She had no instances of purging or other

serious eating disorder behaviors that could not be managed at a lower level of

care. She was adherent with her meal plan.  Her family was supportive, and she

had several successful passes outside the facility without incident. Ongoing

16

treatment to address this patient's psychiatric symptoms and eating disorder

behaviors could reasonably have been addressed in a less restrictive environment,

for example an IOP." (AR0082-3). Nearly every denial leading up to Dr. Allen's

ultimate denial, was based upon Jessica's failure to meet the MCG for Residential

Acute Behavioral Level of care; there was no other meaningful rationale provided

or other standards considered.[6]  And to the extent BCBS argues that the denial in

June of 2015 considered eating-disorder specific factors relative to PHP, because

Avalon had erroneously submitted a claim for PHP rather than RTC, see (AR0068;

0777-78), both the denial of reconsideration and expedited appeal relied upon the

---

[6] On 4/29/15- Dr. Lal found Jessica did not qualify for RTC care, but would not inform Jessica's treatment team of the guidelines he was using for his determination.  (AR0496) Dr. Lal, was using the MCG, and found: no abnormal lab results, not an imminent danger to yourself or others, no medical instability, can be safely treated in a less restrictive environment such as PHP. (AR0027). On 5/1/15- Dr. Heldings, overturned Dr. Lal's denial on appeal finding that Jessica did meet the MCG for continued treatment at RTC level because she "has some issues with mood and anxiety. The patient had a recent purge after looking at herself in the mirror. The patient remains orthostatic."  Dr. Heldings, applying the same guidelines, authorized additional RTC treatment. (AR0024). This recommendation was made despite telling Jessica's treatment team that she didn't meet the criteria for RTC.  (AR0495). 5/20/15- Review by Dr. Chadraskehar, found Jessica did not to meet MCG for ED RTC level of care because: "Your current weight [is] 115.6 pounds. You have stable vitals standing and sitting. You struggle but complete[ ] meals. There is no evidence of medical instability. You are not suicidal or homicidal and are not displaying any aggressive or threatening behaviors." He found Jessica could be treated in EDPHP (AR0010).  5/22/15 Expedited appeal assigned to Dr. Lal. He found Jessica did not meet "medical necessity" for RTC and recommended no PHP, but IOP. Again he refused to tell Jessica's treatment team the criteria he was using to make his decision. (AR0491). Dr. Lal was using the MCG and found Jessica did not meet continued RTC treatment level for the following reasons: "There was no report of psychosis or mania. No abnormal lab results reported. You were not reported as being an imminent danger to self or others. You were not reported as being aggressive or threatening. From the clinical evidence, you can be safely treated in a less restrictive setting such as ED Intensive Outpatient (IOP). (AR0007).

17

same factors addressed in outlined in the MCG in relation to an RTC acute level of care.[7]

Instructive to the court is a decision entered in *Charles W. v. Regence BlueCross BlueShield of Oregon*, 2:17-CV-00824-TC, 2019 WL 4736932, (D. Utah Sept. 27, 2019), *order clarified*, 2:17-CV-00824-TC, 2020 WL 1812372 (D. Utah Apr. 9, 2020).  There Charles W. sought benefits from Regence Blue Cross Blue Shield of Oregon (Regence) for inpatient mental health treatment his daughter, Zoe, received at New Haven Residential Treatment Center.  *Charles W.*, 2019 WL 4736932 at *1.  There the plaintiff argued that the MCG were not the appropriate standard to assess fitness of Zoe for discharge because the type of inpatient care addressed by the MCG pertains to acute or emergency inpatient hospitalization, not sub-acute residency programs.  *Charles W.*, at *5.  Plaintiff relied upon findings entered in *H.N. v. Regence BlueShield*, Case No. 15-cv-1374

---

[7] *See*, (letters dated 6/18/15 and 6/19/15 (AR0131-33); (6/19/15 notes at AR0112-13)(Jessica fails to meet PHP level of care for the following reasons: "[t]here was no report of medical instability. No abnormal lab results reported. There was no evidence of inability to adequately care for yourself with functioning in multiple sphere areas. You were not reported as being aggressive or threatening. There was no report of psychosis or mania." (AR112). The basis for the expedited appeal relied on the same acute RTC factors: Jessica did not meet the MCG for PHP admission because: there was no evidence of inability to adequately care for yourself with functioning in multiple sphere areas. There was no report of psychosis or mania. No abnormal lab results reported. There was no report of medical instability. She is near her ideal body weight. You could be treated safely and effectively in a less restrictive level of care, EDIOP. (AR0110).

RAJ, 2016 WL 7426496 (W.D. Wash. Dec. 23, 2016).  The *H.N.* court criticized

Regence for relying exclusively on the MCG in making its determinations:

> The MCG might be a helpful tool but were not intended to operate as a sole
> basis for denying treatment or payment. The MCG are to be applied to
> individual patients on a case-by-case basis and always in the context of a
> qualified healthcare professional's clinical judgment....Though the MCG are
> recognized by physicians and hospitals, they are "by no means the sole
> measure of medical necessity."

*Id*. at *4. The court also noted that the MCG seemed particularly
inapplicable to New Haven:

> New Haven is a non-acute [Residential Treatment Center (RTC) ]. REG
> 3447. A non-acute RTC typically treats patients for a longer duration and
> has less emphasis on constant safety monitoring than an acute facility. *Id*.
> "Peer-reviewed scientific studies have shown that for patients with persistent
> behavioral disorders that have not responded to outpatient therapy, long-
> term non-acute RTCs provide highly effective treatment." *Id*. The industry
> standards for non-acute RTCs differ from those of acute RTCs....

> The MCG, however, only account for residential acute levels of treatment.
> See, e.g., REG 3770. With that said, the MCG cite to an article describing
> the different levels of care for children and adolescents, including the
> residential treatment level. REG 3793. The article states that residential
> treatment typically lasts from six months to several years. *Id*.

*Charles W.,* at *5.  Regence urged the Court not to apply the rationale of *H.N.*,  to

Charles W.'s case, because it relied upon a different administrative record.  The

Court, however, noted Regence provided no compelling reason why the findings

about the services provided by New Haven as a non-acute residential treatment

center, and the application of the MCG to the services provided, would not apply.

"[T]hose conclusions appear applicable to any record."  *Id*. at *6.

With this rationale in mind, a review of the administrative record reveals it was precisely due to the acute and imminent factors outlined in the MCG, and relied upon by BCBS in examining the medical necessity of Jessica's treatment, that many relevant factors detailed in Jessica's treatment, progress, and struggles were not considered by BCBS.  Conversely, there were factors applied in Jessica's request for benefits that had absolutely no relation to her unique mental health issues.

Before this Court BCBS concedes that Jessica was never a danger to others, (Doc. 46 at 18), yet this factor was repeatedly considered in the coverage denials detailed above.  *See* f.n. 6 & 7.  Moreover, according to the MCG "imminent danger to self" is only a valid consideration if there is: an imminent risk of recurrence of suicide attempt or act of serious harm; a current plan for suicide or serious harm; command auditory hallucinations for suicide or serious harm; or, engagement in danger behavior that cannot be adequately monitored at a lower level. *Id*. at 19. BCBS stresses the importance of **imminent** danger. *Id*.

Accordingly, while BCBS acknowledges that on June 14, 2015, Jessica engaged in self harm upon return to Avalon after her 1-week home visit, the injury to her wrist did not constitute "serious harm" according to BCBS.  *Id*. Likewise, BCBS acknowledges the following day, Jessica had high self-harm urges, but she did not want to act on them.  *Id*.  BCBS contends that after June 29, 2015, Jessica

20

largely denied suicidal or self-harm thoughts and any such thoughts that were

reported did not pose an imminent danger to herself as required by the MCG.  But

limiting consideration to the MCG omits important information.

On July 6, 2015, Jessica reported to her therapist that on a scale of 1 to 10

she was a 9 for self-harm urges and thoughts.  Because Jessica was unable to

contract for her own safety, she was moved to quarter-hourly clinical watch.

(AR0304).  The following day Jessica reported an 8 out of 10 for self-harm urges,

appeared depressed, and was deemed a risk for self-harm behavior.  She remained

on quarter-hourly watch.  *Id*.  On July 8, 2015, Jessica was feeling very stressed

and had continued self-harm urges, but did not act on them and, instead told the

staff.  She advised her psychiatrist self-harm was the way she used to cope with

such feelings.  Her psychiatrist added a prescription of Propranolol twice a day, to

help Jessica manage her distress. (AR0476). Jessica continued to struggle with

self-harm thoughts and urges and was not stepped off clinical watch until July 10,

2015.  She also was unable to contract for safety multiple times.  During this

corresponding period, Jessica's therapist cancelled a scheduled home pass due to

safety concerns.  (AR0411).  When she eventually did go on her two-week

rescheduled home pass in July, Jessica noted that she experienced strong self-harm

urges.  (AR0299).  Upon return to Avalon, Jessica continued to struggle with self-

harm ideation and passive suicidal ideation, at one point noting that she wished she

didn't exist, but also acknowledged she had no plan or intent. (AR0296-7). Because Jessica lacked a concrete plan and/or did not actually harm herself, none of these incidences were even considered by BCBS in analyzing Jessica's claim for benefits, because there was no imminence in the perceived danger.

BCBS also argues that because Jessica completed three therapeutic home passes, from June 6, 2015 to June 14, 2015; from July 18, 2015 to July 31, 2015; and, from July 31, 2015 to August 21, 2015, following each of which she was compliant with her meal plan, confirmed she took all of her medication as directed, and drank all of her fluids, she correspondingly had no issues with self- care. (Doc. 46 at 20.)  Thus, according to BCBS these passes preclude any finding that she could not care for herself at a lower level.

A closer look at the record reveals BCBS's assessment is not accurate.  After Jessica returned to Avalon on June 14, 2015, following her first one-week therapeutic pass, due to increased self-harm urges she engaged in self-harm and was placed on clinical watch as discussed above.  (AR0308).  Also during this pass, she weighed herself twice and her body image became increasingly worse which led to urges to restrict.  *Id*.; see also (AR0119, 0479).  Jessica expressed fear about giving up her eating disorder because it helped alleviate her body image distress.  (AR0385).  Jessica stated concern to her providers that while she can "keep her stuff together" on 1 or 2 week passes, she doesn't believe she can sustain

long term recovery and is fearful others don't realize the extent to which she is struggling.  *Id.*

At Avalon, Jessica was on a semi-structured meal plan because she struggled with IE (intuitive eating). (AR0438).  On July 7, 2015, Jessica was then moved to a modified IE plan due to her weight trending down, which made Jessica "feel[ ] like a failure."  (AR0303, 0437).  It wasn't until nearly a week later that she was moved back to a full IE plan. (AR0435).

While on her July pass, Jessica's weight decreased slightly and she attempted to, but could not eat at McDonalds. (AR0474).  She also restricted her food intake 5-6 times and explained that she worried about the lack of structure in the future, as having the opportunity to restrict is a significant trigger for her eating disorder. (AR0474).  Jessica also explained her fear of returning to school was exacerbating her ED thoughts and urges. (AR0297).  On 8/11/15, Jessica was placed back on a modified IE plan, because her weight was again trending down. (AR0428-9).

On her final home pass, Jessica continued to struggle, which even her father observed.  (AR0293).  Jessica noted she restricted for 7 days total, especially in relation to snacks and felt that she didn't do well with fluids. (AR0424).  She did not feel her final pass went well.  *Id.*

/ / /

23

Thus, Jessica did struggle both while on pass and upon her return to Avalon. As noted by her therapist, "[Jessica] continued to demonstrate ongoing periods of depressed mood after she returned from therapeutic leave of absence passes, which caused an increase in anxiety followed by depression because she feared others would [think] she was 'doing better than she actually was.'" (AR0290). Additionally, even while at Avalon, while under supervision and the care of a dietician, Jessica still had difficulty adjusting to her meal plans and caring adequately for herself.   But consideration of these circumstances was precluded by BCBS's application of the MCG.

BCBS then argues that Jessica had no severe disability *or disorder*[8] requiring acute residential intervention.  In support of this argument, BCBS argues that Avalon records indicate the absence of symptoms such as hypomania or mania and that Jessica exhibited a linear and organized thought process.  (Doc. 46 at 22). Further, BCBS contends that there is no indication in the medical records that the PHP treatment Jessica received from May 22, 2015 to June 5, 2015, failed to manage her health disorder related symptoms or conditions so as to necessitate re-admission to residential treatment.  *Id*. Finally, BCBS contends Jessica's records document her close relationship with her brother, father, and mother, and that she

---

[8] Plaintiff notes this was left out of BCBS's brief in reference to the MCG. (Doc. 56 at 23).

24

had an IOP treatment team in place in Bozeman, demonstrating she had an

adequate support system at home.  *Id.*

    As an initial matter, and as Jessica points out, BCBS's contention that

Jessica exhibited "a linear and organized thought process" is simply gleaned from

a line contained in her psychiatric progress notes, which omits the corresponding

statement, "Insight and judgment are poor and memory is intake."[9] Each one of

Jessica's psychiatric progress notes contained the same statement, some of these

notes corresponded with the time period in which Jessica's RCT and PHP were

approved by BCBS, some of the notes correspond to the time when her treatment

coverage was denied.  Also, this appears to be where BCBS developed the

argument relative to Jessica's lack of hypomania or mania. But, as indicated in the

records, this was never a treatment issue or concern for Jessica- never once in her

psychiatric treatment was there a concern of mania, rather this seems to be

perfunctory language contained in the psychiatrist's standard report form.

    Additionally, the PHP treatment was not adequate to manage Jessica's

disorder, as evidenced by her treatment team's determination that she needed to

---

[9] The note in its entirety reads as follows: "**Mental Status Examination**: The patient presents alert and oriented.  She is dressed casually and hygiene appears good.  She makes good eye contact and is cooperative.  There is no evidence of tics or abnormal movements.  Her mood is more euthymic and her affect is responsive.  There is no psychomotor agitation or retardation. Speech is fluent and coherent.  Thought process is linear and organized.  There are no hypomanic or manic symptoms noted.  She denies SI/HI/SIB. Insight and judgment are poor and memory is intact." The same note appears in all of Jessica's psychiatric Progress Notes from March 18, 2015 to August 17, 2015.  (AR1206-1223).

level back up to RTC care on June 14, 2015, following the episode of self-harm, discussed above.  During the period of PHP, Jessica had difficulty completing meals on time, required a structured meal plan to maintain weight, refused meals, and had continued nausea and anxiety surrounding meals. (AR0449, 481)  Jessica also continued to have urges to over exercise and restrict her food. (AR0391).

BCBS also minimizes the dysfunction of Jessica's familial relationships. While she certainly had a supportive family, each member was invested in Jessica's role as a chronically ill individual.  Shortly after her admission, Avalon explained the importance of ED education to Jessica's care manager at BCBS- As both Jessica and her mom seemed to have attachment to her being "chronically ill'" and that the goal of treatment would be "getting [Jessica] to a place where she will never have to come back to RTC level of care so we are working on helping her develop the skills not to fall back on her ED when stress and anxieties come into her life."  (AR0499).  Moreover, while the sickness role was explored in family therapy, it was "emotionally treacherous" to discuss this role in relationship to the challenging family dynamics that hold the sickness role in place; both Jessica and her mother acknowledge fear of the unknown. (AR0317).  Jessica had never been able to realize that the stomach issues are anxiety based and the family is having difficulty with letting go of the "chronically ill" role.  (AR0495).  The treatment team found there was a need to address the family system being fused

26

with Jessica's sickness role in order for her to sustain a level of care lower than RTC. (AR0491).  The family dynamics were explored and addressed continually through Jessica's treatment in both her individual and family therapy sessions.[10] (AR0290).  In family therapy Jessica's parents worked on building effective listening skills to improve communication and building awareness of ineffective interpersonal patterns within the family system.  *Id*.  They received psychoeducation eating disorders, behavioral parenting strategies, and active listening while also exploring the family culture.  Jessica's therapist "strongly recommended" the family continue in therapy in order to continue building insight into how family dynamics interfere with Jessica's progress as she transitions home, to build communication, and to disrupt old system patterns.  *Id*.  Thus, Jessica's family structure, while supportive, was also one of the main components enabling Jessica's disorder and that needed to be addressed in Jessica's treatment and recovery.  But again, the rigid application of the MCG precluded consideration of this material.

BCBS concedes that Jessica did not have a co-morbid substance use disorder. (Doc. 46 at 22).  This concession underscores the inutility of the MCG as applied in the instant case.

---

[10] Jessica was seen 2-3 times per week for individual therapy and once weekly for family therapy, primarily with her parents.

Finally, BCBS asserts Jessica did not require a structured setting for continued around the clock care after June 15, 2015, as evident by her successful completion of therapeutic home passes.  But, as discussed at length above, there were concerning issues with each home pass, consideration of which were not made by BCBS.  Rather BCBS's denial focused on Jessica's ability to initially gain weight and then maintain her weight gain, but Jessica's body mass index, while important, was not the primary concern of her treatment.  Nowhere in its review, did BCBS directly consider Jessica's complicated physiological history and anxiety and the correlation these factors had with her eating disorder. Jessica's belief that she was an individual who had chronic physical problems, rather than psychological problems, stemmed from the medical issues she had experienced beginning at the age of 12.  Although Jessica's treatment team shared with BCBS that she used her sickness role to engage in eating disordered behavior and that Jessica's fixation on being sick was based upon "a lot of GI issues" the team felt was misdiagnosed, see (AR0493), this issue was not considered in BCBS's denial of benefits.  Also tied up in Jessica's sickness role and anxiety was her phobia of attending school. This was also an ongoing and important concern addressed in her treatment. *See e.g.* (AR0375).

Throughout her stay at Avalon, the treatment team worked tirelessly to help Jessica make this connection, in order to ensure her long-term success at recovery.

28

In April, Jessica's therapist, Dr. Jenna Glover, noted that awareness of the connection between her anxiety and gastric problems was improving slowly and that this lack of awareness was a "significant relapse risk factor" at a lower level of care. (AR0318). On May 1, 2015, Dr. Borghasian noted that Jessica had not yet been able to realize that her stomach issues are anxiety based and that she would relapse immediately if discharged. (AR0495). In therapy Jessica continued to express frustration with her medical team for suggesting her gastric symptoms were psychological rather than medical in nature; Jessica maintained that her nausea was separate from her eating disorder. Her therapist opined that this was "her biggest relapse factor" and that "Jessica remains very fragile and continues to regress each time she feels nauseous." (AR0313, 315). Jessica's psychiatrist, Dr. Paige Barnard, echoed these same concerns. (AR0481, 483).

Even following Jessica's transition to PHP, she remained highly invested in the sickness role, complicating her treatment and recovery. Her awareness into the mind-body connection remained limited in spite of her treatment. As a result, psychoeducation was planned for Jessica's continued therapy sessions. (AR0391). Additionally, Jessica's therapist utilized motivational interviewing to explore other aspects of Jessica's identity, aside from that of being a chronically ill person, in an effort to assist Jessica with a vision of what it would be like to be a healthy person. (AR0387, 89). Upon readmission to RTC in June of 2015, Jessica admitted to her

psychiatrist that she continued to struggle with letting go of her sick role. (AR0479).   Jessica's continued identity as a chronically ill person was addressed again in early August, as she continued to maintain the identity.  (AR0474).  The following week Jessica and her psychiatrist challenged the sick role and the fact that Jessica is bonded to the idea that she is someone with a chronic illness. (AR0472).  In a therapy session on August 12, 2015, the cost of Jessica holding on to her sick role and the isolation it has caused her over the years was addressed. (AR0296).  On August 20, 2015, Jessica learned of the recommendation that she would be discharging from Avalon and expressed anger toward her treatment team, but indicated she was willing to try to attend school and engage in treatment with her IOP team in Bozeman.  (AR0295).

Thus, it appears that Jessica's treatment team, which consisted of: a therapist who she saw 2-3 times a week for individual therapy and once weekly for family therapy; a dietician who she saw 2 times per week to develop meal plans and strategies; a nurse who she saw daily for monitoring of weight and vital signs; a nurse practitioner who she saw 2-5 times per week depending on necessary health and medication management; see (AR0287), and a  psychiatrist who she saw at least 19 times, see (AR1206-1223), were in the  in the best position to make credible recommendations regarding the medical necessity of her residential treatment.  *See Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income*

*Prot. Plan*, 349 F. 3d 1098, 1099 n.8 (9th Cir. 2003) (although treating physician gets no special weight under ERISA, the district court may "take cognizance of the fact (if it is a fact in a particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator")(internal quotation omitted).

Based upon all of these factors, the Court concludes the MCG should not have been applied in this case and that once disregarded, and the entire administrative record is reviewed, Jessica has demonstrated by a preponderance of the evidence that her summer 2015 residential treatment at Avalon was medically necessary.  *See Muniz*, 623 F. 3d at 1294.

### Rate of Reimbursement for Spring Treatment

Jessica argues BCBS agreed to enter into a single case agreement ("SCA"), agreeing to the cost and terms of Avalon's services for a single negotiated rate due to BCBS having inadequate network providers.  (Doc. 55 at 16).  Jessica argues that because BCBS failed to honor its agreement for an SCA, she is entitled to benefits pursuant to the SCA. Jessica claims that on February 24, 2015, a BCBS representative named Rodney confirmed that there was no in-network eating disorder treatment facility within 50 miles of Jessica's home and that, accordingly, BCBS would agree to a SCA with Avalon.  (Doc. 55 at 17).  Jessica then asserts that on February 25, 2015, Tammy, a BCBS representative, telephoned Avalon and

confirmed that she had approved the SCA.  *Id*.  What transpired from then was a series of confusing calls made to BCBS representatives by Avalon representative seeking to put this SCA into place.  *Id*.  In support of her claim that an SCA was agreed upon in February of 2015, Jessica cites to a May 26, 2015, member appeal form that Loreen Thompson, Avalon's Financial Coordinator, submitted to BCBS on her behalf.  *Id*., referencing (AR1329).  Jessica claims that BCBS failed to respond to this appeal.  Jessica cannot provide an amount agreed upon, but points to an SCA negotiated by Blue Cross with another patient later in 2015.  *Id*. at 18.

Resolution of this issue is reached by review of the administrative record, which plainly defeats Jessica's claim.  Avalon's own insurance notes indicate that on February 25, 2015, Loreen Thompson received a call from Tammy at BCBS, "[s]he said they would not do a[n] SCA, but would allow us to be an in-network provider."  (AR0501).  On March 16, 2015, Ms. Thompson called Tammy back to let her know Jessica was admitted that morning.  Loreen reminded Tammy that "she said claims will be paid in-Network since there is not a provider within 50 miles of her home."  *Id*.

The record reveals that BCBS affirmatively declined to enter into an SCA, but did agree to grant Avalon an in-network exception. Accordingly, the plan terms control and Avalon's services, as an out-of-network provider, should be compensated equal to "the payment Blue Cross Blue Shield of Montana would

32

make if the healthcare services had been obtained within the Blue Cross and Blue

Shield of Montana service area."  (AR0838).

### Motion to Strike

Relative to the purported SCA claim, Jessica seeks to strike additional

documents filed by BCBS in support of its motion for summary judgment.  (Doc.

59).  Specifically, these documents consist of the Declaration of Simone

Wilkinson, describing BCBS's compensation schedule. (Doc. 47-1).  These

documents indicate that in 2015 BCBS compensated residential treatment services

at a $525 per diem rate, and partial hospitalization services at a $300 per diem rate.

(Doc. 47-1 at 3-4, 6-7). Jessica argues the disclosure is untimely, because BCBS

failed to provide the documents in its Rule 26 initial disclosures.  (Doc. 59 at 2-3).

BCBS responds that the documents in question became relevant only after the

close of discovery, and under Fed. R. Civ. P. 37(c) are either "harmless" or

"substantially justified."  (Doc. 62 at 6).

But given the Court has already found that no SCA existed and that Jessica

was entitled, under the terms of plan to be compensated at the rate of an-in network

provider, the rate of reimbursement is relevant.  Jessica's motion to strike (Doc.

58) will be denied.

The Court has a concern, however, regarding the rate of reimbursement for

PHP.  According to BCBS's document PHP compensation rate is listed as "N/A."

(Doc. 47-1 at 7).  On the second rate sheet provided, PHP for Behavioral Health &/or Eating Disorder is blacked out, while Chemical Dependency PHP is listed at $300 per diem.  *Id*. at 10.  The parties shall confer and discuss the applicable 2015 in-network payment rates and advise the Court if there is any additional compensation owed to Jessica.

### Fees and Costs

Section 502(g)(1) of ERISA authorizes the court to award attorney's fees. 29 U.S.C. § 1132(g)(1) ("the court in its discretion may allow a reasonable attorney's fee and costs of action to either party"). A claimant is entitled to attorney's fees "if the court can fairly call the outcome of the litigation some success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255–56, (2010). The Ninth Circuit has stated, "[w]e ordinarily grant a prevailing beneficiary in an ERISA action reasonable attorneys' fees and costs, absent special circumstances cautioning against it." *Boston Mut. Ins. v. Murphree*, 242 F.3d 899, 904 (9th Cir. 2001).  The Court has determined that Jessica U has sufficiently prevailed to warrant an award of attorney fees.

This Court's practice has been to allow the parties to attempt resolution of the attorney fee issue prior to entering a fee award.  The parties shall meet and attempt to resolve the fee issue immediately upon receipt of this order.  If the parties are unable to resolve this issue by Monday, November 16, 2020, Jessica

may submit a motion for fees, properly supported by the appropriate declaration supporting her fee claim.

### Conclusion

The parties have stipulated to de novo review of the administrative record. The Court accepts the administrative record as sufficiently developed to enable a full exercise of this Court's independent judgment as required by *Kearney*, 175 F.3d 1095.  After close and careful consideration of the record, it appears that Jessica has met her burden.  The Court finds that BCBS based its decision to deny Jessica's claims for benefits based solely upon the application of the MCG which had limited utility in this case involving a non-acute admission to a residential treatment facility.  Accordingly, BCBS shall pay the benefits due to Jessica under the plan for her summer 2015 treatment at Avalon.  Additionally, the administrative record reveals that no SCA was entered into by the parties.  Jessica shall be reimbursed for her spring RTC and PHP treatment under the terms of her plan at the rate granted by exception as an in-network provider.  Jessica's motion to strike will be denied.  The parties shall confer regarding BCBS's rate of reimbursement for PHP and shall, by separate motion, advise the Court if there is any additional payment owed to Jessica under the terms of her plan.  Accordingly,

the Court having determined under *Kearney*, 175 F. 3d at 1094-95, that summary judgment is inappropriate under these circumstances,

IT IS HEREBY ORDERED that Defendant BCBS's Motion for Summary Judgment (Doc. 45) and Plaintiff's Motion for Summary Judgment (Doc. 54) are construed as Motions for Judgment under Fed. R. Civ. P. 52( c), and Plaintiff's Motion is GRANTED in part and DENIED in part and Defendant's Motion is DENIED in part and GRANTED in part.  Defendant shall pay Plaintiff for her Summer 2015 RTC at Avalon.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike (Doc. 59) is DENIED.

IT IS FURTHER ORDERED that the parties shall confer and discuss the applicable 2015 in-network payment rates and the attorney fees issues and advise the Court if there is any additional compensation owed to Jessica on or before November 16, 2020.  If the parties are unable to resolve the attorney fee issues by that date, Jessica may submit a properly supported motion for fees.

DATED this 5th day of November, 2020.

_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE